## Commonwealth vs. Ronald Rhoades, Jr.

Suffolk.  November 5, 1979. — February 19, 1980.

Present: Hennessey, C.J., Quirico, Kaplan, Wilkins, & Abrams, JJ.

*Homicide.  Proximate Cause.  Arson.  Practice, Criminal,* Directed verdict, Examination of jurors, Instructions to jury. *Evidence,* Expert opinion, Other offense, Admitted fact. *Identification.*

At the trial of indictments charging the defendant with arson, three counts of first degree murder, and one count of second degree murder, there was sufficient evidence for the jury to conclude that the fire was set by the defendant wilfully and maliciously, and that the fire was the proximate cause of the deaths of three persons in an adjoining apartment and the death by coronary thrombosis of a firefighter. [815-817]

At an arson trial, the judge did not abuse his discretion in qualifying as an expert witness regarding the cause of the fire a fire department captain who had never before testified as an expert in Superior Court, and there was adequate foundation for the witness's opinions that an accellerant had been used and that the fire had been set. [817-819]

At an arson trial, the judge did not abuse his discretion in admitting testimony of two Red Cross volunteer workers who had observed the defendant standing opposite the burning building during the course of the fire that they had seen the defendant on other occasions where the judge specifically excluded any reference to the fact that the prior identifications had taken place at fires; nor was the judge required to give limiting instructions with respect to the prior identification testimony in the absence of a request by the defendant. [819-821]

At a criminal trial, the judge did not err in refusing to ask potential jurors on voir dire certain questions aimed at ascertaining their understanding or acceptance of the presumption of innocence. [821-822]

At a criminal trial, the judge did not err in refusing to charge the jury that, if the evidence is susceptible of two reasonable interpretations, it is the jury's duty to adopt the interpretation which points to the defendant's innocence and reject the other which points to his guilt where the jurors were correctly instructed on the Commonwealth's burden of proof and reasonable doubt. [822]

At a criminal trial, the judge's instructions on the issue of witness credibility, although skeletal, were adequate. [822-823]

At the trial of a defendant charged with arson and second degree murder in connection with the death of a firefighter by coronary thrombosis,

the judge erred in charging the jury that if the defendant's act in setting the fire constituted a link in the chain of events leading to the firefighters' death, the defendant could be convicted. [823-825]

INDICTMENTS found and returned in the Superior Court on January 10, 1978.

The cases were tried before *Brogna, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Willie J. Davis* for the defendant.

*Stephen M. Needle,* Assistant District Attorney (*M. Ashley Brown,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

ABRAMS, J. Pursuant to G. L. c. 278, §§ 33A-33G, the defendant Ronald Rhoades, Jr., appeals three convictions of murder in the second degree on three indictments which charged murder in the first degree, a fourth conviction of murder in the second degree on an indictment which charged second degree murder, and a conviction of arson. Rhoades argues assignments of error concerning (1) the denial of his motions for directed verdicts of not guilty; (2) the admission of certain expert testimony; (3) the admission of testimony suggesting that Rhoades had been present at other disasters; (4) the refusal of the judge to put additional questions to potential jurors on voir dire; and (5) the judge's instructions to the jury.[1]

We conclude that Rhoades' conviction of arson, and three of his four convictions of murder in the second degree should be affirmed. We accept, however, Rhoades' argument that the charge to the jury regarding the fourth murder indictment failed to describe adequately the causal connection which must exist between a defendant's act and a person's death in order for the Commonwealth to obtain a conviction on the theory of felony-murder. We therefore

---

[1]Assignments of errors not briefed are deemed waived. *Commonwealth* v. *Amazeen,* 375 Mass. 73, 74 n.1 (1978).

reverse this conviction. See G. L. c. 278, § 33E; note 12, *infra*. We have also considered the balance of the record pursuant to our responsibilities under G. L. c. 278, § 33E, and find that there is no reason to exercise our discretion to order a new trial or a reduction in sentence on any of Rhoades' remaining convictions of murder in the second degree.[2]

We summarize the evidence. Santos Velasquez Murillo (Velasquez) and his family occupied the first floor apartment at 174 Pearl Street, Chelsea. The apartment was located in a three story complex with three apartments on each side. The building was numbered 172-174 Pearl Street.

On December 31, 1977, Velasquez was at home taking care of his infant daughter. Between 9 and 9:30 P.M., Rhoades arrived at Velasquez's apartment. Rhoades was not expected and had not been invited to the apartment. Approximately three weeks earlier, however, Rhoades had stayed overnight at the Velasquez apartment.[3] Velasquez showed Rhoades into his living room and offered the defendant a beer. The men sat together in the living room; however, since Rhoades spoke no Spanish and Velasquez only very little English, there was little or no conversation between them. Rhoades drank two or three beers.

At approximately 10:30 P.M., Vasquez, a friend of Velasquez, arrived at the apartment. Velasquez and Vasquez had some conversation in Spanish but neither one conversed

---

[2] The judge ordered Rhoades to serve concurrent sentences of life imprisonment for two of his four murder convictions. On the arson charge he sentenced Rhoades to a term of not less than fifteen and not more than twenty years at Massachusetts Correctional Institution, Walpole to be served concurrently with these two life sentences. Finally, the judge imposed additional life sentences on each of the remaining two murder convictions (including the conviction we reverse here), such sentences to run concurrently with each other but from and after the sentences imposed on the other two murder convictions. We note that the record on appeal does not contain the probation report or the record of convictions. The defendant does not claim error in the imposition of consecutive sentences. We do not find the sentences to be duplicative. Cf. *Commonwealth* v. *Stewart*, 375 Mass. 380, 393 (1978).

[3] Rhoades had also visited Velasquez some months earlier. The two men worked in different parts of the same factory.

with Rhoades. At 10:55 P.M. Rhoades stated that he was going to the bathroom and asked for a cigarette. He took one, the first he had smoked that evening, from Velasquez's pack on the coffee table and lit it with Velasquez's lighter. The cigarette was the only thing in the defendant's hand as he left for the bathroom. Neither Velasquez nor Vasquez saw Rhoades again that evening.

The bathroom in the Velasquez apartment was located near the front door to the apartment. Rhoades knew where it was, due to his visit to the apartment three weeks earlier. On a shelf on the wall opposite, rather than next to, the toilet, stood a bottle of rubbing alcohol approximately six inches high and one-half to three-quarters full. The bottle had been in the bathroom at the time of Rhoades' visit three weeks earlier. When last seen on the night of the fire, the bottle, which was plastic, was capped. Finally, on the linoleum floor of the bathroom, were some dirty clothes and a plastic tub of diapers.

Approximately five minutes after the defendant left the living room, Vasquez smelled smoke, and Velasquez then saw flames. The smoke and fire prevented them from leaving by the front doorway. Vasquez therefore broke a window in the baby's bedroom and escaped. Velasquez woke his sleeping child, handed her out the window to his friend, and climbed out himself.

Shortly before the fire broke out, Paul Capozzi was standing on the steps outside the entrance way to number 172, waiting for his mother to return home to her second floor apartment on the number 172 side of the building. Capozzi saw the defendant come out of number 174 and turn right onto Pearl Street, walking at a "little faster" than normal pace. Rhoades passed within an arm's length of Capozzi, and proceeded to the corner of the block. After disappearing from sight for approximately one minute, Rhoades reappeared, walking back up Pearl Street, to a position in front of a garage, directly across from number 172-174. The defendant paused briefly, before proceeding at a normal or slightly slower than normal pace down the street to the op-

posite corner of the block, finally returning to stand across the street in front of the garage once again. At this point, Capozzi, diverted by the fire which had broken out at number 174, lost track of the defendant's movements.

Walter Juskiewicz was babysitting for three children, Michael and Dennis Elliot (ages 3 and 4) and Shawn Marceau (4 months), in the second floor apartment directly above the Velasquez residence. Shortly after 11 P.M., Cathy Capozzi was outside 173 Pearl Street, across the street from her mother's apartment. She saw Walter Juskiewicz come to the second floor window at number 174, yelling for help. He dropped the baby Shawn to persons below, and disappeared from view. During the course of the fire, Juskiewicz and the two Elliot children perished due to asphyxia caused by smoke inhalation.

The first alarm for the three alarm blaze was sounded at 11:03 P.M. Among the firefighters responding to the second alarm was Captain James Trainor. When Trainor entered the burning building in an attempt to rescue persons thought to be trapped inside, he was outfitted in standard firefighting gear: rubber coat, helmet, boots and a self-contained breathing apparatus. The temperature outside was in the 20's. Attempting to assist those fighting the fire, Trainor encountered intense heat and thick smoke, and experienced difficulty in getting air through his face mask. While on the roof of the building, Trainor collapsed; taken to a hospital in Everett, he was pronounced dead on arrival. The Commonwealth's medical expert concluded that the combination of cold weather, stress, and smoke inhalation precipitated the coronary thrombosis which caused Trainor's death.

On January 3, 1978, two Chelsea police detectives and a member of the State police, all in civilian clothes, went to Rhoades' residence to question him concerning the fire at 172-174 Pearl Street and to arrest him on a warrant charging Rhoades with nonsupport. Shortly after two of the officers appeared at Rhoades' third floor apartment and spoke to Rhoades' wife, the defendant walked out of a ground

floor rear door being watched by the third officer. When this officer identified himself, Rhoades, who was separated from the detective by a five foot fence, began running away. Rhoades was arrested at gun point.

Experts concluded that the fire was set. Further they found that the fire began in the bathroom of the Velasquez apartment, that an accelerant was used to start the fire (presumably the rubbing alcohol), that the accelerant had to be ignited by an open flame, and that an accidently dropped cigarette was insufficient to ignite the accelerant or to start the fire.

1. *Directed verdict.* At the close of the Commonwealth's case, the defendant moved for directed verdicts of acquittal. "In reviewing the denial of a motion for directed verdict, we consider only the evidence introduced up to the time the Commonwealth rested its case." *Commonwealth* v. *Borans, ante* 117, 134 (1979). *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976). We must determine whether the Commonwealth's evidence, "considered in its light most favorable to the Commonwealth, was sufficient to permit the jury to infer the existence of the essential elements of the crime charged," *Commonwealth* v. *Dunphy,* 377 Mass. 453, 456 (1979), and "to bring minds of ordinary intelligence and sagacity to the persuasion of . . . [guilt] beyond a reasonable doubt." *Commonwealth* v. *Cooper,* 264 Mass. 368, 373 (1928). *Commonwealth* v. Latimore, 378 Mass. 671, 677 (1979). Finally, such evidence must exist in regard to each element of the crime with which the defendant was charged. *In re Winship,* 397 U.S. 358, 364 (1970).

The evidence was sufficient to send all five indictments to the jury. The evidence of the experts, if believed, would have warranted the jury in finding that the fire started in Velasquez's bathroom, that an accelerant was used, and that an open flame was needed to ignite the accelerant.[4]

---

[4] The fact that no accelerant was found on the samples taken from the floor of the bathroom after the fire went to the weight, not the competency, of the evidence.

The jury could have found that the fire would have been contained in the bathroom for five minutes before smoke and flames were visible. Velasquez and Vasquez saw smoke and flames approximately five minutes after Rhoades said he was going to the bathroom.

Physical evidence found at the fire scene by the experts and testified to by them permitted the jury to infer that an accelerant was used. The intensity of the heat and the smoke also supported the inference that an accelerant was used. A chemist testified as to the flash point of rubbing alcohol, and gave an opinion that an open flame was required to ignite it.

Rhoades contends that even if these facts support an inference that an accelerant was present on the floor of the bathroom such facts do not indicate how the accelerant came to be there or how it might have been ignited. Instead, Rhoades argues, the facts lend equal support to a conclusion that the bottle of rubbing alcohol was accidently spilled and accidently ignited.

Whatever may be the merits of this argument in other circumstances, on the facts of this case, the jurors were warranted in finding credible the Commonwealth's experts' conclusion that an open flame is required to ignite rubbing alcohol and that a dropped cigarette would not suffice. Further, the evidence supported a jury finding that the accidental dropping of a lighted cigarette on the dirty clothes was not the cause of the fire. The jury also could have found that Rhoades' furtive conduct in leaving the Velasquez apartment without saying anything, going to the corner and then returning to the garage opposite the apartment building indicated consciousness of guilt, a desire to observe what happened to the fire he set. In sum, the Commonwealth's evidence was sufficient for the jury to conclude that the fire was set by Rhoades wilfully and maliciously "with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse." *Commonwealth* v. *Lamothe*, 343 Mass. 417, 420 (1961),

quoting from *Commonwealth* v. *York,* 9 Met. 93, 104 (1845).

Finally, the necessary causal connection between the defendant's actions and the deaths occuring during the course of the fire could also reasonably have been inferred. If the jury reached the permissible conclusion that Rhoades set the fire, his actions plainly caused the deaths of Juskiewicz and the Elliot children.[5] Furthermore, in light of the evidence that Captain Trainor's fatal coronary thrombosis was brought on by his efforts in fighting the fire, the evidence supported an inference that Rhoades' actions were the proximate cause of Trainor's death.

This is not a case where the guilt of the defendant is left to conjecture and surmise with no sound basis in fact. Moreover, the evidence does not, as suggested by the defendant, tend equally to support either of two inconsistent propositions. Cf. *Commonwealth* v. *Croft,* 345 Mass. 143, 145 (1962). Rather, the chain of circumstances permitted the jury to infer that the defendant "wilfully and maliciously" set the fire. For all these reasons, the defendant's motions for directed verdicts were properly denied.

2. *Admission of expert testimony.* The defendant claims that one of the two experts to testify for the Commonwealth as to the cause of the fire, Captain Robert Better of the Chelsea fire department, lacked sufficient skill, knowledge and experience in the investigation of arson to testify as an expert witness regarding the cause of the fire. We disagree.

---

[5] In regard to these deaths, we note that Rhoades does not specifically contend that there was no evidence to warrant the judge in submitting the issue of murder in the first degree to the jury. In light of our responsibilities under G. L. c. 278, § 33E, we have, however, considered this issue. "Since the defendant was acquitted of murder in the first degree, he must demonstrate prejudice on the record in order to urge such a contention. The record here does not disclose any prejudice to the defendant from the submission of the first degree issues to the jury. Moreover, our review of the entire record under § 33E leads us to conclude that, in any event, the judge was correct in submitting the facts to the jury on the issue of 'deliberate premeditation.'" *Commonwealth* v. *Amazeen,* 375 Mass. 73, 81 n.6 (1978).

See generally *Commonwealth* v. *Vitello*, 376 Mass. 426, 440-441 (1978); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 591-592 (1956); *Commonwealth* v. *Russ*, 232 Mass. 58, 78, 79 (1919). See also W.B. Leach & P.J. Liacos, Massachusetts Evidence 97 (4th ed. 1967). Cf. Fed. R. Evid. 702-705.

Better was in charge of the Chelsea fire prevention bureau, and had personally investigated the causes of more than fifty fires. Better possessed an associate degree in fire science, and had attended the Massachusetts firefighting arson school and the State police arson school, as well as several seminars in the State of New Hampshire. While the defendant stresses that prior to this trial Better had never testified as an expert in Superior Court, even for the most highly qualified expert there must always be a first time.

There was ample evidence in this case to support a conclusion that the jury might receive appreciable assistance from the testimony of Captain Better. Whether or not a fire is incendiary in origin is not generally a matter within the scope of common knowledge of an ordinary juror.[6] See *Commonwealth* v. *Harris*, 1 Mass. App. Ct. 265, 268-272, further review on other grounds, 364 Mass. 236 (1973). We see no reason to upset the finding of the trial judge that Better was qualified to render an opinion as to the cause of the fire. *Commonwealth* v. *Seit*, 373 Mass. 83, 91-92 (1977).

Rhoades also challenges the admission of Better's opinion that an accelerant was used and that the fire had been set. Contrary to Rhoades' suggestion, Better did not base his

---

[6] The defendant does not argue that *Commonwealth* v. *Rodziewicz*, 213 Mass. 68 (1912), or *Higgins* v. *Dewey*, 107 Mass. 494 (1871), requires that the question of the incendiary origin of fires be held a matter generally within the knowledge of ordinary jurors, and that expert testimony must therefore be excluded. We read *Rodziewicz* as, at best, standing for the proposition that expert opinion is not required to demonstrate that char marks must have been caused by something hot. And we would agree with the Appeals Court's comment regarding the *Higgins* case in *Commonwealth* v. *Harris*, 1 Mass. App. Ct. 265, 269 (1973), that an agrarian population's common knowledge of the dangers of brushfires cannot be analogized to our present urbanized population's understanding of the causes of fires in buildings.

opinion that the fire was set solely on the presence of an accelerant. Rather, he testified that an open flame was needed to ignite the accelerant. The burn patterns found at the scene, as well as the intense heat and smoke at the fire, all tended to support his conclusion. We think that there was an adequate foundation for each of Better's opinions.[7]

3. *Prior occasion identifications.* Red Cross volunteer workers Charles Crocker and Robert Albanese testified that they had observed the defendant standing opposite the burning building at 172-174 Pearl Street during the course of the fire. Rhoades does not contest the admission of this testimony, but rather the admission of additional testimony by Crocker that he had observed the defendant earlier the same day at 2:15 A.M., "for a good 20 minutes," and by Albanese that he had also seen the defendant earlier that day at approximately 2:30 A.M. for a period of about an hour, and on three or four previous occasions for a period of better than one hour each time. The volunteers, who testified that they assisted at other disasters as well as at fires, did not indicate where they had seen Rhoades on these previous occasions.

Rhoades claims that the only reasonable inference to be drawn from the volunteers' testimony was that he had committed prior crimes of arson. The principle upon which Rhoades relies "is well established: commission of an independent crime cannot be admitted to show commission of the crime charged." *Commonwealth v. Imbruglia,* 377 Mass. 682, 695 (1979). "Ordinarily, evidence of other crimes and prior misconduct of which the defendant might be guilty may not be received. . . . This rule stems from the belief that such evidence forces the defendant to answer

---

[7] A State police officer assigned to the fire marshal's office reached substantially the same conclusions. This testimony was not objected to by Rhoades. The State police officer also testified that an open flame is required to ignite rubbing alcohol (the presumed accelerant), and that an accidentally dropped cigarette will not suffice. Moreover, the semicircular uneven path of the char marks warranted the jury in concluding that the accelerant was not accidentally spilled.

accusations not set forth in the indictment, confuses his defense, diverts the attention of the jury, and may create undue prejudice against him." *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978). Rhoades contends that although the volunteers testified that they provided services to victims of disasters other than fires, the jury can only realistically be assumed to have inferred that the previous identifications took place at other fires. This initial inference that the defendant was present at other fires is said to suggest, as a second inference, that Rhoades was guilty of setting all the fires at which he had been seen. This second inference, in turn, is said to suggest a third inference, namely that Rhoades had set the fire at 172-174 Pearl Street. While the necessity of the jury's drawing this chain of inferences may reduce the possibility of prejudice to Rhoades, a substantial danger of such prejudice remains.

Although the question is close, we cannot say that the trial judge abused his discretion by admitting the prior identification testimony. The judge specifically excluded any reference to the fact that the prior identifications had taken place at fires, and went out of his way (including posing questions to the witnesses) to assure that the volunteers indicated that their activities were not limited to attendance at fires. The two volunteers were the only witnesses to place the defendant at the scene of the fire during the height of the blaze, and the accuracy of their identification, while not essential, was nonetheless an important aspect of the Commonwealth's case. We note that Rhoades' offer to stipulate [8] as to the accuracy of the volunteers' identification does not affect the issue of admissibility. "The defendant's willingness to stipulate to a fact does not preclude the Commonwealth from proving it." *Commonwealth* v. *Nassar,* 351 Mass. 37, 46 (1966).

---

[8] It is not at all clear that a stipulation to the effect that the Red Cross volunteers knew Rhoades would have avoided the claimed prejudice. The identifications, of course, depend on their being able to recognize Rhoades from some source.

Finally, while the defendant suggests in this court that the prejudicial impact of the volunteers' testimony could have been offset by curative instructions to the jury at trial, the defendant did not press for such instructions at trial. "If the defendant wanted the judge to provide limiting, or curative, instructions he should have made the proper request. Judges are not required, on their own, to instruct juries as to the purposes for which evidence is offered during trial." *Commonwealth* v. *Monsen*, 377 Mass. 245, 252 (1979). See *Commonwealth* v. *Roberts*, 378 Mass. 116, 126 (1979), and *Commonwealth* v. *Selesnick*, 272 Mass. 354, 357 (1930).

4. *Voir dire questions.* The defendant claims constitutional error in the refusal of the trial judge to pose the following questions to potential jurors: (1) "Can you accept the proposition of law that a defendant is presumed to be innocent, has no burden to establish his innocence, and is clothed throughout the trial with this presumption?" (2) "Would the fact the Mr. Rhoades was arrested in this case interfere with your ability to presume he is innocent?" (3) "Do you feel that since Mr. Rhoades has been indicted that he is therefore guilty?"[9]

Denial of the requested questions did not amount to constitutional error. Questions not aimed at "revealing racial bias or any similarly indurated and pervasive prejudice" are not constitutionally required. *Commonwealth* v. *Bailey*, 370 Mass. 388, 399 (1976). See *Commonwealth* v. *Harri-*

[9] We have recognized that some Federal precedent exists for the proposition that failure to ask questions similar to those requested by the defendant constitutes, as a matter of Federal common law, an abuse of discretion. See *Commonwealth* v. *Bailey*, 370 Mass. 388, 399-400 (1976), and cases cited. In particular, a divided Sixth Circuit in *United States* v. *Blount*, 479 F.2d 650, 651-652 (1973), held the denial of a requested voir dire question identical to the first of the three questions at issue here to be reversible error. The Tenth Circuit, however, had previously reached a directly contrary result, *Grandsinger* v. *United States*, 332 F.2d 80 (10th Cir. 1964), and other circuits have declined to follow the "minority view" of the *Blount* court. *United States* v. *Price*, 577 F.2d 1356, 1366 (9th Cir. 1978), cert. denied, sub nom. *Mitchell* v. *United States*, 439 U.S. 1068 (1979). See also *United States* v. *Wooton*, 518 F.2d 943, 946 (3d Cir.), cert. denied, 423 U.S. 895 (1975), and *United States* v. *Ledee*, 549 F.2d 990, 992-993 (5th Cir.), cert. denied, 434 U.S. 902 (1977).

*son,* 368 Mass. 366 (1975). On the record before us there is no evidence to support Rhoades' assertion that many jurors do not understand or accept the presumption of innocence.[10]

5. *Instructions to the jury.* The defendant argues three exceptions to the judge's charge. We conclude that read as a whole this charge, while laconic, nevertheless survives Rhoades' first two challenges. We find error, however, in the judge's failure to explain adequately to the jury the necessity that they find the defendant's act to be the proximate cause of the death of Captain Trainor. We consider each of Rhoades' arguments in turn.

(a) *Interpretation of the evidence.* The defendant claims error in the denial of his request that the jury be charged that "if the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject the other which points to his guilt." There is no error.[11] "The judge was not required to instruct the jury in the precise language requested by the defendant. It is enough if the instructions were otherwise adequate, although not making specific reference to the particular facts which the defendant asked the judge to state or emphasize." *Commonwealth* v. *Harris,* 376 Mass. 201, 208 (1978). The jurors were correctly instructed on the Commonwealth's burden of proof and reasonable doubt. Indeed, the defendant does not contend otherwise in this court.

(b) *Credibility.* The defendant requested that the jury be instructed on the issue of credibility. On appeal he claims that the judge's instructions were correct as far as they went but that the judge failed to focus on those factors

---

[10] On appeal the defendant makes no claim that G. L. c. 234, § 28, requires the questions, or that any particular juror should have been further interrogated. The record reveals that the judge allowed several questions beyond those required by statute.

[11] We intimate no view on whether the granting of such a request might impliedly suggest to the jury that the Commonwealth could prevail on a standard less than proof beyond a reasonable doubt.

pertaining to witness credibility which a jury should consider in deciding issues of credibility. We agree with the defendant that the instructions on credibility were skeletal but we conclude that, viewing the charge as a whole, the instructions were adequate.

In substance, the judge instructed the jury that they could accept or reject the testimony of any witness or accept a part of what a witness said and reject the rest. The judge emphasized that this was true of the expert witnesses they had heard, as well as the nonexpert witnesses. The judge informed the jury that it was not necessary to give any credence to evidence just because he mentioned it. He defined direct and circumstantial evidence and told the jurors that they must decide the case on the evidence they heard and believed "to a moral certainty." The judge instructed the jurors that they and they alone had to decide the issues of drunkenness from the "evidence about drinking." The judge gave fairly full instructions on the presumption of innocence, the Commonwealth's burden of proof and the definition of reasonable doubt. Viewing the impact of the charge as a whole, we conclude that there was no error in the charge on credibility. *Commonwealth* v. *Godin*, 374 Mass. 120, 130-131 (1977).

(c) *Proximate cause.* The trial judge charged the jury that if Captain Trainor died "as a result" of Rhoades' act, or if Rhoades' act "in any way contributed to hasten, or was part of the proximate cause" of Trainor's death, then Rhoades could be liable for second degree murder.[12] The

---

[12] A reading of the record indicates that at trial it was the defendant's theory that the Commonwealth was required to prove that the fire was the sole or exclusive cause of Captain Trainor's death. The defendant claimed an exception to "the Court's explanation that it's not necessary for the Commonwealth to prove — that it [the fire] was the exclusive and sole reason for death, but was a contributing cause." It would have been incorrect for the judge to have instructed the jury that the fire must be the exclusive and sole reason for death. See *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 463 (1942); *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861). See also *Commonwealth* v. *Fox*, 7 Gray 585, 588 (1856). See generally *Wallace* v. *Ludwig*, 292 Mass. 251 (1935); *People* v. *Stamp*, 2

judge charged that if the jury found beyond a reasonable doubt, that Rhoades' act was a "contributing cause" of Trainor's death, then Rhoades would be criminally liable. The over-all effect of this charge was to leave the jury with the impression that if Rhoades' act in setting the fire in any way constituted a link, no matter how remote, in the chain of events leading to Trainor's death, Rhoades should be convicted. We conclude that this formulation exposed Rhoades to potential liability for events not proximately caused by his felonious act in setting the fire.[13] See *State* v. *Newman,* 162 Mont. 450, 461-462 (1973) (charge that the jury must find that defendant's act "contributed to or was the proximate cause of" the victim's death held to misstate the law because disjunctively phrased). See generally, R. Perkins, Criminal Law 685-738 (2d ed. 1969).[14]

Cal. App. 3d 203 (1969), cert. denied, 400 U.S. 819 (1970); *Booker* v. *State,* 386 N.E.2d 1198 (Ind. 1979); *Mason* v. *Commonwealth,* 423 S.W.2d 532 (Ky. 1968); *State* v. *Luther,* 285 N.C. 570 (1974). Thus, the defendant did not bring the error now argued on appeal to the judge's attention in terms specific enough to give the judge an opportunity to correct this error. See *Commonwealth* v. *McDuffee, ante* 353, 357 (1979). Moreover, the defendant made an assignment of error based on his exception which claimed that the instruction permitted the jury to convict on "something less than the required standard of reasonable doubt." On appeal, Rhoades argues that the instructions on "proximate cause [were] confusing and therefore constitute reversible error." In light of this record, we treat Rhoades' challenge to the instructions regarding proximate cause under G. L. c. 278, § 33E.

[13] A finding that Rhoades' conduct was the proximate cause of Trainor's death is an inference that a jury could well have drawn from the evidence in this case. On appeal, Rhoades does not contend otherwise. The Commonwealth's medical expert found that Trainor's efforts in fighting the fire "precipitated" the thrombosis that caused his death. The defendant's expert testified that the stress of fighting the fire "contributed to" Trainor's "final thrombosis." Nevertheless, a defendant is entitled to have the law correctly explained to the jury.

[14] On this appeal, the defendant does not contest the premise that a person, found to have set a fire in circumstances constituting arson, may be convicted of murder or manslaughter if a firefighter dies in the performance of his duties. See *State* v. *Glover,* 330 Mo. 709 (1932). Rather he claims that the jury should have been clearly instructed that the arsonist's act must constitute not just a cause, but also the proximate cause of the firefighter's death.

This misimpression is not corrected by the impact of the instructions evaluated as a whole. *Commonwealth* v. *Burke,* 376 Mass. 539, 544 (1978). Nothing said to the jury by the judge indicated that proximate cause in Captain Trainor's death "is a cause, which, in the natural and continuous sequence, produces the death, and without which the death would not have occurred." California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979).

The judge, apparently responding to the defendant's theory that he was criminally responsible only if he were the sole cause, merely attempted to instruct the jury that if Rhoades' conduct contributed to Trainor's death, Rhoades could be convicted. See California Jury Instructions, Criminal § 8.58 (4th rev. ed. 1979). He emphasized that the fire need not be the sole cause, but failed to instruct the jury clearly that the defendant's conduct must be the efficient cause, the cause that necessarily sets in operation the factors which caused the death. The judgment on the indictment charging Rhoades with the death of Captain Trainor is therefore reversed, the verdict set aside, and the case remanded to the Superior Court for further proceedings consistent with this opinion.

Pursuant to G. L. c. 278, § 33E, we have reviewed the entire record for consideration of the law and the evidence. We decline to exercise our power under § 33E in favor of the defendant with respect to any of the three remaining verdicts of guilty of second degree murder. The judgments on these verdicts, and the judgment on the verdict of guilty of arson, are affirmed.

*So ordered.*