COMMONWEALTH *vs.* ALLEN R. JENNER.

Middlesex.    October 7, 1986. — September 30, 1987.

Present: GREANEY, C.J., QUIRICO, & GRANT, JJ.

*Practice, Criminal,* Plea, Assistance of counsel. *Homicide. Proximate Cause.*

Where the evidence presented by the prosecution during the trial of indictments for murder and unarmed robbery, together with admissions by the defendant at the hearing held in accordance with Mass.R.Crim.P. 12(c) after he agreed to enter pleas of guilty, tended to prove that the defendant had chased the victim, an elderly man, along public ways and across a parking lot where the victim fell face first in the snow and that the defendant jumped on him and then robbed him, after which the victim died "as a result of exposure to cold and/or asphyxia," the judge correctly concluded that the combination of the evidence at the trial and the information developed at the plea hearing was sufficient to establish a factual basis, including the element of proximate cause, on which to accept a plea of guilty to so much of the murder indictment as charged the crime of manslaughter. [771-776]

Where the evidence at a trial of murder and unarmed robbery indictments, together with admissions by the defendant at the hearing held in accordance with Mass.R.Crim.P. 12(c) after he agreed to enter pleas of guilty, established a factual basis sufficient to support a plea of guilty to so much of the murder indictment as charged the crime of manslaughter, the defendant had no ground for contending that his trial counsel had provided ineffective assistance by advising the plea. [776]

INDICTMENTS found and returned in the Superior Court Department, five on April 5, 1978, and two on May 13, 1981.

Motions for postconviction relief, filed on July 16, 1984, and April 26, 1985, were heard by *Charles R. Alberti,* J.

*Kimberly Homan* for the defendant.

*Natalea Skvir,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. On April 5, 1978, the grand jury returned seven indictments against the defendant charging him with a variety of offenses allegedly committed on March 9, 1978. On May 13, 1981, the grand jury returned two more indictments against him for offenses allegedly committed on or about February 9, 1978. Further details of these indictments are set forth in the margin.[1]

The defendant was first brought to trial by jury on November 19, 1981, on indictments nos. 81-1440 charging him with the murder in the first degree of one Charles Karapoulis (the victim), and 81-1441 charging him with unarmed robbery of the victim. On November 24, 1981, after the prosecution had presented all of its evidence, and after discussions between the defendant, his then trial counsel, and the prosecutor, the parties informed the trial judge that they had reached the following plea agreement, subject to the court's approval: (a) the defendant would plead guilty to so much of indictment no. 81-1440 as charged the crime of manslaughter, and he would

---

[1] The indictments are the following:

| Indict-ment No. | Date Returned | Dates of Offenses | Offenses Charged |
|---|---|---|---|
| 78-1329 | 4-05-78 | 3-09-78 | Breaking and entering a dwelling house in the nighttime and assault on Banks |
| 78-1330 | 4-05-78 | 3-09-78 | Breaking and entering a dwelling house house in the nighttime and assault on Weiss |
| 78-1331 | 4-05-78 | 3-09-78 | Unarmed robbery from Banks |
| 78-1332 | 4-05-78 | 3-09-78 | Assault with intent to rob Weiss |
| 78-1333 | 4-05-78 | 3-09-78 | Assault and battery by means of a dangerous weapon on Banks |
| 78-1334 | 4-05-78 | 3-09-78 | Assault and battery on police officer |
| 78-1335 | 4-05-78 | 3-09-78 | Assault and battery on Banks in one count and on Weiss in another count |
| 81-1440 | 5-13-81 | on or about 2-09-78 | Murder, first degree, of Karapoulis |
| 81-1441 | 5-13-81 | on or about 2-09-78 | Unarmed robbery from Karapoulis |

plead guilty to each of the eight other indictments pending against him, (b) the prosecutor would recommend that the defendant be sentenced to the Massachusetts Correctional Institution at Walpole (M.C.I., Walpole, now Cedar Junction) for a term of eighteen to twenty years on the manslaughter charge and for sentences of appropriate terms on the other indictments, with all sentences to run concurrently with each other, (c) it would be open to defense counsel to argue for the imposition of a sentence or sentences shorter than those to be recommended by the prosecutor, and (d) the judge would not be bound by the recommendations of counsel as to any sentence or sentences.

The judge then proceeded in accordance with the requirements of Mass.R.Crim.P. 12(c), 378 Mass. 867 (1979), under the title "Guilty Plea Procedure," and upon completion of the hearing required thereby he stated that he would accept the pleas which had been tendered. After the pleas were duly stated by the defendant and recorded, the judge imposed on the defendant the following sentences to M.C.I., Walpole, all to be served concurrently: from eighteen to twenty years on each of indictments nos. 81-1440, 81-1441, 78-1329, 78-1330 and 78-1331, and eight to ten years each on indictments nos. 78-1332 and 78-1333. Indictments nos. 78-1334 and 78-1335 were placed on file. The defendant is in custody pursuant to those sentences.

The defendant has filed two motions that he be allowed to withdraw his pleas of guilty and that he be granted a trial on the indictments against him. The first motion, filed pro se on July 16, 1984, seeks relief on the ground that "his action in pleading guilty was not voluntary nor done in a rational understanding manner and, further, that he did not receive the effective assistance of counsel." The second motion, filed by assigned counsel on April 26, 1985, seeks relief on the grounds that there was "an insufficient factual basis for accepting a plea of guilty to so much of indictment no. 1440 as charged manslaughter," that the pleas of guilty "were premised upon the trial court's erroneous representation to the defendant that there existed a sufficient factual basis to convict him of manslaughter," and that he "was deprived of the effective assistance of counsel."

The first motion was denied by the trial judge on September 19, 1984, without a hearing thereon. The second motion, entitled "AMENDED MOTION FOR POST-CONVICTION RELIEF," was heard by the judge on December 18, 1985, and denied by him on February 18, 1986, in a ten-page "MEMORANDUM OF DECISION." The defendant seasonably appealed from the denial of both motions, and both appeals are now before us. For reasons discussed later in this opinion, we affirm the trial judge's denial of both motions.

Since the principal argument by the defendant's appellate counsel is that there was "an insufficient factual basis for accepting a plea of guilty to so much of indictment 1440 as charged manslaughter," it may be helpful to review the evidence and information which were before the trial judge as of the time that he accepted that plea of guilty. Since this is a case where there was a partial trial and then a hearing and other proceedings as required by Mass.R.Crim.P. 12(c), the judge was not limited to considering only the evidence which had been presented by the prosecution in deciding whether to accept the plea of guilty of manslaughter. *Huot* v. *Commonwealth*, 363 Mass. 91, 101 (1973). See *Commonwealth* v. *Sullivan*, 385 Mass. 497, 508 (1982). We shall therefore review first the evidence which had been presented by the prosecution, and then the information which the judge obtained during the "Guilty Plea Procedure" under Mass.R.Crim.P. 12(c).

In February, 1978, the defendant and Robert J. Griffin, then both about twenty years old, lived at 65 Belmont Street in Marlborough, the defendant occupying some rooms as a subtenant of Griffin at an agreed rent of twenty dollars per week. On the evening of the second day of a snowstorm, which is often referred to as the "Blizzard of 1978,"[2] Griffin and the defendant walked from their house to or toward the center of the city. While there they saw an elderly man leaving a lounge (liquor establishment), and they followed him for a few blocks

---

[2] Climatological evidence introduced at trial indicated that eight inches of snow fell on February 6, 1978, nineteen inches on February 7, 1978, and one inch on February 8, 1978.

along several well-lighted streets near the center of the city, until he turned into an unlighted parking lot. When they followed him into the parking lot, he started to run and the two of them, also running, chased him as he ran. The man, later identified as Charles Karapoulis (the victim), fell, going face first into the snow. The defendant continued to run after the victim, who was then down in the snow, and jumped on his back in a straddling position with one leg on each side of him. While testifying to these events, Griffin demonstrated the position of the two men, with the prosecutor taking the position of the victim, and Griffin the position of the defendant. After jumping on the victim, the defendant struck the victim once, and Griffin told him not to do so. While the defendant was on the victim, the latter's legs were moving for about a minute, but there was no movement by the victim after the defendant got off him. The defendant and Griffin left the victim face down in the snow, and they did not look back or return to the parking lot. As they were leaving the lot, the defendant told Griffin not to tell anyone what had happened there.

After leaving the victim and the parking lot, the defendant and Griffin headed toward their house but separated before arriving there. When Griffin arrived home later that evening, the defendant, who was already there, gave Griffin three hundred dollars and said, "We're even," or something to that effect. Since moving in with Griffin, the defendant had not been employed and had paid Griffin no rent. Griffin assumed the money was payment for rent plus an amount owed him by the defendant for some damage the defendant had caused to Griffin's car.

About 5:30 P.M. on February 9, 1978, the Marlborough police went to the parking lot in response to a telephone call, and they found the frozen body of the deceased victim, face down in the snow, with only the feet and parts of his legs showing. The police removed the snow from the body, searched the victim's body for identification, and found only a paper with some numbers on it. They called for a medical examiner, who in turn caused the body to be removed to a hospital morgue for examination. The doctor found that at some time a

tracheotomy had been surgically performed on the victim. It consisted of a hole or opening of less than one inch in diameter through which the man could breathe. There were no bruises or other signs of trauma on the body. There was some vomitus, including a small amount of blood, in the mouth and on one cheek. After his examination of the body, the medical examiner signed a death certificate stating that the victim's death was due to "asphyxiation by aspiration." In his testimony the doctor explained that " '[a]sphyxiation' means the person is not getting enough oxygen to survive. They, you could say, strangle, and in this case, with the amount of vomitus and so forth present in the mouth, aspiration means . . . that the most likely thing was that he had vomited and aspirated some vomitus to interfere with his breathing so that he couldn't survive, couldn't get air." In the place where the death certificate asked whether the cause of death was "Accident, Suicide or Homicide. (Specify)," the medical examiner wrote "None."

Several days after the incident at the parking lot and the death of the victim, the defendant, while holding a newspaper in his hand, told Griffin "that the man died of natural causes and he [the defendant] was free and clear." About two weeks later the defendant moved out of the Griffin premises at 65 Belmont Street in Marlborough.

On April 5, 1978, the grand jury returned indictments nos. 78-1329 through 78-1335 against the defendant for various crimes allegedly committed on March 9, 1978.[3] He was arraigned and pleaded not guilty to those indictments on April 10, 1978, and he disappeared from the Marlborough area very shortly thereafter.

On April 27, 1978, Griffin went to the Marlborough police station and told Detective Arthur C. Brodeur about the February, 1978, incident, involving himself, the defendant, and the victim. Before Griffin said anything to the police officers, he was informed of his Miranda rights.[4] The day after that talk Detective Brodeur sought and obtained an arrest warrant for

---

[3] See note, 1, *supra,* for information of these indictments.

[4] Reference to "Miranda rights" means those rights declared and established in *Miranda* v. *Arizona,* 384 U.S. 436, 467-477 (1966).

the defendant, whose whereabouts were then not known to the police, on a charge of assault with intent to rob. Also following Griffin's conversation, the police took steps to have the body of the victim exhumed. An autopsy was performed on May 25, 1978, by a forensic pathologist assisted by the medical examiner. As a result of the autopsy the two doctors concluded that the victim's death "was as a result of exposure to cold and/or asphyxia."

On April 12, 1980, the defendant, was arrested by the police of San Francisco, California, as the result of information furnished to them by the Marlborough police. When first arrested the defendant gave his name as "Scott Forbes," but when a search of his person revealed papers bearing the name of "Allen Jenner" he admitted that was his true name. His arrest was on the basis of process which had issued pursuant to the incident of March 9, 1978, at Marlborough, and which resulted in indictments nos. 78-1329 through 78-1335.[5] After he was informed of his Miranda rights and of the basis for his arrest, the defendant was also told by the San Francisco police that he might be charged with a homicide or murder allegedly committed by him in Marlborough on or about February 9, 1978. The defendant denied to the police that he had participated in such a crime, but he told them that he had received information from some source that the body of the victim of the alleged Marlborough homicide had been exhumed.

On July 19, 1980, Detective Brodeur and an officer of the Massachusetts State police flew to San Francisco and brought the defendant back to Massachusetts. After the return flight to Boston, the defendant and Brodeur were driven to the jail in Billerica. During that trip Brodeur gave the defendant a typewritten statement of his Miranda rights and also informed him orally of those rights. After the defendant stated that he understood those rights, Brodeur asked him for, and the defendant gave, information as to his name, address, Social Security number, date of birth, age, height, weight, and family relationships. In answer to questions about the evening during the

---

[5] See note 1, *supra.*

February, 1978, storm the defendant said he was at home with Griffin and other persons all that evening. Brodeur told the defendant that Griffin had given him a different statement about that evening. The defendant then asked Brodeur about the murder charge, and about what was meant by murder and intent to murder. Brodeur explained what they meant, after which the defendant said that he and Griffin did follow and chase the victim, Charles Karapoulis, on that evening, that he did "jump him [the victim], but that he did not mean to kill him, or intend to kill him." Brodeur asked him how much money he took from the body of the victim, to which the defendant answered that he did not remember. When Brodeur pressed him with a question whether the amount was approximately $100, $200 or $300, the defendant said he would like to think it over before he answered any more questions. There were no more questions.

The evidence which has been summarized above comes from the testimony of four prosecution witnesses: Robert J. Griffin; Detective Brodeur of the Marlborough police; Dr. Robert Rittenhouse, the medical examiner for the area which includes Marlborough, and Harold Suslow, an inspector-sergeant of the police department of San Francisco, California.

In addition to the prosecution testimony, there was information which the trial judge obtained in the hearing and proceedings under Mass.R.Crim. P. 12(c). In the defendant's answers to questions put to him by the trial judge during that hearing and related proceedings, the defendant described the happenings of the February, 1978, evening substantially as the witness Griffin had described them, except that he denied striking the victim after jumping on him. When asked by the judge whether he hit the victim he answered, "No sir, I didn't have to. When I was there the man was breathing heavy, very fast, rapidly." When he asked him to give his version of what happened that evening, the defendant said, "I admitted that I had run after Mr. Karapoulis, and when I arrived he was down on his haunches lower than a kneel, and I had taken his money from him." He also said that on that evening he had partaken of

some valium and beer. He said that he did not know that the victim had a breathing problem as indictated by his tracheotomy. He said that the victim "was breathing extremely heavy" when he left him in the snow in the parking lot.

The "Guilty Plea Procedure" prescribed by Mass.R.Crim. P. 12(c) (5) includes the following language pertinent to the alleged lack of a "factual basis" on which the defendant is basing his claim for relief: "(5) *Hearing on Plea; Acceptance*. The judge shall conduct a hearing to determine the voluntariness of the plea and the factual basis of the charge. . . . The failure of the defendant to acknowledge all of the elements of the factual basis shall not preclude a judge from accepting a guilty plea. . . ." At that hearing the judge questioned the defendant and thereafter discussed the sufficiency of the evidence which had been presented at the trial and the additional information obtained at the change of plea hearing. He concluded that the combination of the evidence at the trial and the information developed at the hearing was sufficient to warrant a jury in finding the defendant guilty of manslaughter and unarmed robbery.[6]

No question is raised about the sufficiency of the factual basis for the crime of unarmed robbery which is punishable "by imprisonment in the state prison for life or for any term of years." G. L. c. 265, § 19.

We turn now to the principal issue of this case, and that is whether there was a factual basis sufficient to support the plea of guilty to the charge of manslaughter. In *Commonwealth* v. *Wallace,* 346 Mass. 9 (1963), the court said, at 13: "The principles governing involuntary manslaughter have been fully discussed in the leading case of *Commonwealth* v. *Welansky,* 316 Mass. 383 [1944], and need not be restated." However, we quote briefly from a subsequent case, *Commonwealth* v.

---

[6] There was further discussion by the judge as to whether the evidence and the admissions by the defendant were sufficient to support a factual basis for a degree of homicide higher than manslaughter, but we need not consider or decide that question since it is not before us. We are concerned only with whether there is a sufficient factual basis for the plea of guilty of manslaughter.

*Campbell,* 352 Mass. 387 (1967), where the court said, at
397-398: "Involuntary manslaughter is an unlawful homicide,
unintentionally caused (1) in the commission of an unlawful
act, malum in se, not amounting to a felony nor likely to
endanger life [citation omitted], or (2) by an act which consti-
tutes such a disregard of probable harmful consequences to
another as to constitute wanton or reckless conduct. *Common-
wealth* v. *Welansky,* 316 Mass. 383, 399. . . . The jury could
also have found Campbell's conduct to be consistent with a
failure to regard the consequences of his action or with an
indifference to what the consequences of his action might have
been, thus rising to wanton or reckless conduct. 'The essence
of wanton and reckless conduct is intentional conduct, . . .
which conduct involves a high degree of likelihood that substan-
tial harm will result to another.' [*Ibid.*] This is so even though
such a result was not intended."

It is clear from the evidence at the trial and the defendant's
admissions at the hearing on the changes of plea that when he
first saw the victim leave a lounge he followed him, first
walking and then running when the victim started to run, that
while being chased by the defendant the victim fell face down
in the snow, where the defendant jumped on him, robbed him
of his money, and then left him in that position. It is also clear
that the victim was later found dead, and his body frozen, at
the place and in the position in which the defendant had left
him. The autopsy produced a conclusion that the victim died
from "exposure to cold and/or asphyxia," and as already noted
above, the victim had vomited, and that interfered with his
breathing "so that he couldn't survive, couldn't get air."

The defendant argues that the victim's death "was neither
the direct or the indirect result of any battery committed by
defendant, but resulted, as the medical testimony conclusively
shows, from a failure of his respiratory system." The question
remains as to whether any act of the defendant was the proxi-
mate cause of the failure of the victim's respiratory system.
The fact that the medical testimony did not link the death to
the defendant's robbery or acts toward the victim does not
dispose of the case. The test is whether there was anything in

the evidence presented by the prosecution, or in the defendant's admissions at the plea hearing, or in the two combined, from which a jury could reasonably infer that the acts or conduct of the defendant was the proximate cause of the victim's death, giving to the words "proximate cause" the meaning attributed to them in *Commonwealth* v. *Rhoades*, 379 Mass. 810, 823-825 (1980). In that opinion the court said that "proximate cause" meant not just "a contributing cause" of the death, but it meant instead "a cause, which, in the natural and continuous sequence, produce[d] the death, and without which the death would not have occurred" (citation omitted).

The trial judge, in deciding under Mass.R.Crim.P. 12(c)(5)(A), 378 Mass. at 869, whether "he is satisfied that there is a factual basis for the charge" to which the defendant offers to plead guilty, is not required to determine whether the defendant is or is not guilty of the offense charged, but he need determine only whether the evidence which he had heard, plus any information he has obtained in the plea hearing, is sufficient, when considered with reasonable inferences which may be drawn therefrom, to support the charge to which the defendant is offering a plea of guilty. We hold that there are several views on which the judge's conclusion that there was a factual base to support the charge of manslaughter must be upheld.

1. There was evidence, plus admissions by the defendant, that the defendant chased the victim, an elderly man, along public ways, across a parking lot where the victim fell face first into the snow, that the defendant jumped him or jumped on him, and then robbed him. In *Commonweath* v. *Bianco*, 388 Mass. 358 (1983), the court said at 362-363: "There is considerable authority for the principle that if, by a wrongful act, a man 'creates in another man's mind an immediate sense of danger which causes such person to try to escape, and in so doing he injures himself, the person who creates such a state of mind' is criminally responsible for those injuries. [Numerous judicial and textbook citations omitted.]" In the same case, Justice Liacos, dissenting, said at 374-375: "Injury during an escape is within the scope of foreseeability by persons intending physical violence . . . . The normal, impulsive ten-

dencies of the victims to escape were caused by the attack of the defendants. See *Commonwealth* v. *Rhoades,* [379 Mass. at 823-825.] Death during the attempt by the victims to avoid further harm was the foreseeable result of the continuous sequence of events caused by the defendants' joint actions. . . . The evidence and the inferences permitted to be drawn reasonably support a finding of proximate causation beyond a reasonable doubt."

In the present case the defendant was wrongfully chasing the victim, at first by walking and later by running, for the purpose and with the intention of robbing him. If, in his attempt to escape, the victim was caused to fall into the snow and in turn vomit, which in turn resulted in the victim's asphyxiation, that would satisfy the requirement of the *Rhoades* case, *supra,* for proximate causation.

2. There was evidence, plus an admission by the defendant, that when he reached the victim, who was then lying face down in the snow, he unlawfully jumped on him and straddled him. That constituted a misdemeanor. G. L. c. 265, § 13A. There is further evidence that the defendant, who was not armed, intended to rob the victim when he jumped on him. That would constitute a felony of assault with intent to rob. G. L. c. 265, § 20. The defendant admitted that while he was straddling the victim he did rob him. That constituted the felony of unarmed robbery. G. L. c. 265, § 19.

If the defendant committed any of the crimes listed in the preceding paragraph, and in doing so caused the victim to vomit, which in turn resulted in the victim's asphyxiation, that would satisfy the requirement of the *Rhoades* case, *supra,* for proximate causation.

3. If the defendant committed any of the unlawful acts of crime listed in parts 1 and 2 above and thereby caused the victim to fall into, or to remain, in a position where, because of his tracheotomy, he was unable to breathe, with the result that he died, that would satisfy the requirement of the *Rhoades* case, *supra,* for proximate causation. The defendant's lack of knowledge of the tracheotomy does not alter the result as to proximate cause. *Commonwealth* v. *Starling,* 382 Mass. 423, 429 (1981).

4. If the defendant chased the victim until the victim fell face first into the snow, then assaulted, or assaulted and beat the victim, including jumping on him, and robbed the victim while he was on top of him, and then left him face down in the snow without helping him or trying to rescue him from the blizzard conditions, with the result that the victim died either from asphyxiation in his own vomit, or from freezing, that would constitute wanton and reckless conduct and it would satisfy the requirement of the *Rhoades* case, *supra,* for proximate causation of the victim's death by the defendant. *Commonwealth* v. *Welansky,* 316 Mass. 383, 396-401 (1944).

The situations described in parts 1 through 4 above are sufficient to illustrate or demonstrate circumstances which, with the drawing of some reasonable inferences therefrom, would satisfy the requirement of a factual basis, or factual bases, to support the trial judge's acceptance of the defendant's plea of guilty of the charge of manslaughter and satisfy the requirements of *Commonwealth* v. *Rhoades, supra,* as to the proximate cause of the death of the victim. The illustrations described are not exclusive, as there may be others. One example of such others is that there was evidence that while the defendant was straddling the victim, he struck him. Although the defendant has not admitted the fact, the lack of an admission alone would not invalidate the defendant's guilty plea. *Huot* v. *Commonwealth,* 363 Mass. 91, 99 (1973). *Commonwealth* v. *Hubbard,* 371 Mass. 160, 171-172 (1976). "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *North Carolina* v. *Alford,* 400 U.S. 25, 37 (1970).

We hold that it was not error for the trial judge to decide that there was a sufficient factual basis on which to accept the defendant's plea of guilty of the charge of manslaughter as included in indictment no. 81-1440, charging the crime of murder in the first degree. It therefore follows that the defendant's claim that, because there was no factual basis for that plea, the plea was "neither knowing and intelligent nor volun-

tary" must also fail. There was no other ground of support for
the claim that the plea was not knowing, intelligent, or volun-
tary.

The only other argument made to this court by appellate
counsel, either by brief or orally, was limited to the allegation
in the defendant's second motion to the effect that "[t]he defend-
ant was deprived of the effective assistance of counsel by his
trial counsel's advice to plead guilty to manslaughter where
trial counsel knew that the Commonwealth had no evidence
that the defendant had caused the decedent's death." The claim
of ineffective assistance of counsel as contained in the defend-
ant's pro se motion was much broader, but appellate counsel
did not assume responsibility for arguing it fully.[7] Appellate
counsel's argument on the alleged ineffectiveness of the defend-
ant's trial counsel is based on the former's assumption that the
latter "knew that the Commonwealth had no evidence that the
defendant had caused the decedent's death" when he advised
the defendant to plead guilty to manslaughter. We conclude
that the assumption was not correct, and that therefore the
claim of ineffective counsel fails.

It is expected that a lawyer will help extricate a client who
is the victim of "ineffective counsel," but counsel coming to
the rescue should remember the following ,caution of Justice
O'Connor in *Strickland* v. *Washington,* 466 U.S. 668, 689
(1984): "There are countless ways to provide effective assist-
ance in any given case. Even the best criminal defense attorneys
would not defend a particular client in the same way."

The motion filed by appellate counsel for postconviction
relief in the form of the withdrawal of his pleas of guilty started
with the allegation that the trial judge erred in deciding that
there was sufficient factual basis for accepting the plea of

---

[7] The defendant's first motion to withdraw his pleas of guilty was prepared
for him by a fellow inmate who, in giving his name, described himself as
"not a member of the Bar of Massachusetts, or any other state," and then
signed his name to the document. The affidavit accompanying the motion
describes trial counsel as "proven to be a walking violation of the Sixth
Amendment to the United States Constitution . . . ." A person in the
defendant's position would be well advised to seek appointment of available
counsel rather than allow himself to be maneuvered by someone "who is
not a member of the Bar of Massachusetts or any other state."

guilty of manslaughter on indictment no. 81-1440, and that the defendant's pleas of guilty on the remaining eight indictments "were premised on the trial court's erroneous representation to the defendant that there existed a sufficient factual basis to convict him of manslaughter. The defendant's pleas of guilty to said indictments were therefore neither knowing and intelligent nor voluntary." Thus the defendant's appellate counsel tied the ultimate decision as to indictments nos. 81-1441 and 78-1329 to 78-1335 to the outcome of the motion to revoke the plea of guilty on indictment no. 81-1440. The decision of the trial judge on indictment no. 81-1440 went against the defendant, and we affirm it; and the same is true as to the other eight indictments. The trial judge denied the defendant's two motions to withdraw his pleas of guilty as to all of the indictments against him[8], and we affirm his ruling as to both motions. However, the motion filed by appellate counsel includes the following request: "6. In the event that the Court refuses to allow the defendant to withdraw his guilty pleas on indictments number 81/1441 and 78/1329-35, the defendant withdraws his request to withdraw his guilty plea on indictment number 81/1440." That seems inconsistent with the rest of the motion and the basis on which it was argued. It appears to be an attempt to withdraw the entire appeal unless we give relief on all indictments which are involved. The defendant submitted the motion to us for decision as to all of the indictments, and he cannot, by inserting such a reservation in his motion, effectively withdraw the motion unless it is allowed as to all indictments. He cannnot place issues before this court and process them to the point of a decision by the court, and, if the decision is against him, withdraw his submission and call it a "no contest." See *Commonwealth* v. *Zion,* 359 Mass. 559, 563 (1971). We do not render optional or advisory opinions.

> *Orders denying motions to*
> *· withdraw guilty pleas*
> *and for a new trial affirmed.*

---

[8] See note 1, *supra,* for a list of those indictments.