COMMONWEALTH vs. ROBERT FARNKOFF
(and eight companion cases[1]).

Middlesex.   February 15, 1983. — July 29, 1983.

Present: HALE, C.J., CUTTER, & KAPLAN, JJ.

*Practice, Criminal,* Examination of jurors, Severance, Mistrial, Discovery, Stipulation. *Identification. Kidnapping. Joint Enterprise.*

The judge at a criminal trial acted within his discretion in determining that the dismissal of one juror on account of her admitted prejudice presented no question of jury prejudice requiring a voir dire investigation of the remaining jurors. [438-439]

At the joint criminal trial of three defendants, a prosecution witness's testimony on cross-examination as to a statement by one of the defendants, linking himself to the other two, which the judge instructed was not admissible against the other two defendants, was insignificant in view of other, stronger evidence placing the defendants together, and thus did not require reversal of their convictions on the principle of *Bruton* v. *United States,* 391 U.S. 123 (1968). [439-441]

At a criminal trial, an outburst by the victim during cross-examination, in effect challenging one of the defendants to take the stand and deny the correctness of her identification of him, was adequately dealt with by the judge, who struck the offending remark after a recess, and thereafter gave sufficient curative instructions to the jury. [441-442]

In the circumstances of the joint trial of three defendants for rape and other serious crimes, a mistrial was not required by reason of the Commonwealth's failure to disclose before trial that on two occasions arrays of photographs had been presented to the victim for identification purposes, where there had been no relevant pretrial arrangement or motion to compel discovery nor any pretrial attempt by defense counsel to test the victim's identifications, and where the judge, following a hearing in the nature of voir dire at the direction of this court, found that the victim's photographic identifications were consistent with her earlier descriptions of her assailants, that the photographic arrays were not unduly suggestive, and that the victim had a sound independent basis for her in-court identification of all three defendants. [442-445]

[1] Two of the companion cases are against Farnkoff, three are against John Winston, and three are against John Landry.

At a criminal trial no error appeared in the judge's refusal to disqualify a prosecution witness who, as one defendant claimed, had been discovered through use of that defendant's statement in violation of the Commonwealth's oral stipulation, where the judge could reasonably conclude that the Commonwealth's use of the statement to discover the witness was not foreclosed by the stipulation, and where the record, moreover, contained no showing that the witness was found after the making of the stipulation. [445-446]

At the joint trial of three defendants for kidnapping, the jury could properly find that one of them, a passenger in the car in which the victim was abducted, joined thereafter in the forcible confinement of the victim against her will. [446]

At the joint trial of three defendants for rape and other serious crimes, the evidence provided no basis for a jury instruction on the issue of withdrawal by one of them from the joint criminal venture. [446-447]

INDICTMENTS found and returned in the Superior Court Department on August 11, 1981.

The cases were tried before *Morse*, J.

*Jane Larmon White* for Robert Farnkoff.

*Michael Manzi* for John Winston.

*Mark B. Schmidt* for John Landry.

*Kevin J. Ross*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Indictments dated in August, 1981, charged the three defendants severally with having committed on July 9, 1981, the crimes of aggravated rape, kidnapping, assault and battery by means of a dangerous weapon, and larceny in an amount under one hundred dollars. Upon joint trial to a jury in November, 1981, the defendants were each found guilty of the aggravated rape and kidnapping as charged, and of assault and battery (as "included" in the charge of that crime committed with a dangerous weapon); they were acquitted of the larceny offense. From the ensuing judgments of conviction, each defendant appeals.

We relate the main facts as they could have been found by the jury, then take up the points of law urged by one or more defendants, adding further record facts or accounts of proceedings as they become relevant to the analysis. Finding no material error, we affirm the judgments.

The victim, a young woman in her twenties, returned from work to her home in Melrose in the late afternoon of Wednesday, July 8, 1981. She made a telephone call to her boy friend in Johnstown, Pennsylvania. Then she phoned her friend Kathy about dinner. They agreed to meet at Kitty's restaurant at the intersection of Routes 28 and 62 in North Reading. Arriving at Kitty's in her car (a 1975 green Camaro) around 9:00 P.M., the victim had dinner with Kathy and Kathy's friend Debbie. They left Kitty's about 12:15 A.M. intending to drop in at the Horseshoe Lounge a quarter of a mile or so to the north on Route 28, but when they got there Kathy and Debbie left in Debbie's car as Kathy said she had to go to work early that morning. The victim went into the lounge and twice attempted to call her boy friend but did not get through. Driving by Kitty's on the way home, she stopped and tried another call from a booth in Kitty's parking lot. It was about 12:35 or 12:40 A.M.

She returned to her car. Half entering it,[2] she was seized from behind by the defendant Robert Farnkoff,[3] and was dragged, struggling, to a car close by. As she was forced to the floor of the back of the car by Farnkoff and the defendant John Winston, who occupied the back seat, she struck her head on some part of the car and for the moment was stunned. Recovered, she found the car was moving. Winston was tearing at her blouse. When she resisted, he struck her and pulled her hair. After a few minutes she was pushed and pulled into the front of the car. Farnkoff was driving and the defendant John Landry was in the passenger seat. Landry ripped off the victim's belt (tearing it) and removed her pants and underwear. He held her down while Farnkoff pressed her breasts; Farnkoff then pushed his fingers into her vagina, and Landry did the same.

About this time the victim made a conscious effort to follow the route of the car and to fix in her mind other details.

---

[2] Her car was later found at the parking lot with the driver's door open.

[3] As later identified. Similarly we use the names of the other defendants in this narrative.

She noticed that her purse (which she thought she had not taken to the telephone booth) was on the floor of the car and while ostensibly searching it for a cigarette she drew out a container of mace which she contrived to hold behind her back.

The car turned off the highway to a road with few houses, then shortly to a bumpy dirt road, and stopped finally at a sort of clearing. It was now past 1:00 A.M. The victim said she had to go to the bathroom and she was led by Landry to the woods. To her pleading he said she should let them do what they wanted and she wouldn't get hurt, she had no choice. She sprayed the mace into his face and as he recoiled and fell she tried to flee but was dragged back into the clearing by the other men, with Winston kicking her in the head and stomach with his hard shoes or boots. A light colored double blanket had been spread on the ground alongside the car. The victim was forced down upon it. Farnkoff got on top of her and penetrated and ejaculated into her. Winston took his turn and penetrated but had not ejaculated when Landry reappeared, kicked Winston away, and in effect ended that episode of rape.

All returned to the car and took their places as before: Winston in the back seat, Farnkoff, Landry, and the victim in front. The car started back. The victim was permitted to put on her clothes and took her purse. On the way Winston was let off at a street in Wilmington. He took some moments clambering out of the two-door car, and the victim at that point looked squarely at him and improved her impression of his face.

The journey continued and led to a parking lot on Route 62 in Wilmington. Landry with the victim left the car and they entered another car parked nearby. The victim observed and wrote on a piece of paper from her purse the license number (361 HIG)[4] of the car — a light colored Ford or Mercury, she thought — in which she had been abducted. She observed also that the car she now entered was a Pontiac, conspicuously old with bad body rot.

---

[4] The record suggests that the number was in fact 360 HIG.

On the drive with Landry the victim said she was out of cigarettes. Landry stopped at a "Dunkin Donuts" on Route 38 and produced some. He said he liked her and wanted to see her again. She asked his name and he said "John"; he indicated it would be dangerous for her to follow up on the names of the others or to report the incident to the police. She gave him her true telephone number believing that she might entrap him. They passed by a police station. Landry said it would not do to stop there because the police knew his car. At length Landry dropped the victim off at the Wilmington Regional Health Center. The time was perhaps 2:00 A.M.

The victim, tearful and shaken, was given some comfort at the Center, and the police were summoned. Preceded by a Lieutenant Purnell, Detective Edward Hayes of the North Reading force arrived about 2:55 A.M. It was decided to move the victim to Lawrence General Hospital which had a rape crisis intervention team using a Johnson rape kit. In these hours the victim told her story to Detective Hayes and again to a nurse at the Lawrence hospital. In a medical view, the victim was found to have some cuts and to require a collar for her neck. Male seminal fluid was taken from her.

The victim wrote an account of the events which she turned over to Detective Hayes on Friday, July 10. That day Hayes drove the victim about in an effort to locate the places mentioned and the car route described by her.

In the evening the Wilmington police, whose aid evidently had been requested, stopped Landry for a traffic violation. Alerted, Detective Hayes went to the scene with the victim. She instantly recognized the beat-up car and Landry who, she said, would have a broken front tooth. He did. Landry was arrested and after Miranda warnings he said at the police station, "Obviously you know it's me. You know the girl got the registration." Landry said the clearing was in a wooded area off Taylor Road in Wilmington. Later the victim, driving about with Hayes, confirmed the clearing, and the path of the car to that place could also be traced.

Winston and Farnkoff were arrested, separately, on July 14. Farnkoff said after being advised of his rights that the girl must be a whore because she hung around the Horseshoe Lounge, and his lawyer would tear her apart. But no mention of the lounge had been made to Farnkoff. The license on his Ford car answered to the number the victim had recorded, and a blanket was found in the car trunk.

There was testimony from witnesses John Hunt and Frank Velozo placing Landry and Winston (and Landry's car) at the Wilmington parking lot in the early evening of July 8, and placing all three defendants together drinking beer out of pitchers at 11:00 P.M. that night at a Ground Round restaurant in Andover, near the North Reading line. This was stated to be about one mile from the Horseshoe Lounge, one and one-half miles from Kitty's, and three to four miles from the Wilmington parking lot.

The victim identified the defendants at the trial in terms corresponding to those she gave Detective Hayes that night and later.[5]

1. *Jury behavior* (argued by Farnkoff and Winston).[6] After the jury had been empanelled, a court officer brought to the judge's attention that one of the jurors was saying she was biased. The juror was brought before the judge, questioned in the presence of the assistant district attorney and counsel for the three defendants and excused for cause — that is, for being probably unable to overcome her announced

---

[5] The descriptions were approximately as follows. The driver (Farnkoff): thin build, 5 feet, 6 to 8 inches, dark complexion, dark curly hair with a curl in front, fat lips. The passenger (Landry): about 5 feet, 10 inches, beard, dark hair, chipped front tooth, large scar 3 by 3 inches on right shoulder (revealed when he removed his shirt before the drive to Wilmington Center). The back seat occupant (Winston): taller than driver, blond or reddish blond uncombed hair, stocky but not fat, blemishes on face. (The defense attacked Hayes' account of the victim's descriptions because little of that nature appeared in his police report which Hayes had dictated as the investigation proceeded. The nurse's report was similarly attacked.)

[6] Landry recorded an objection but he has not briefed the point and thus has abandoned it. Mass.R.A.P. 16(a), as amended, 367 Mass. 921 (1975).

prejudice. One of the questions put to the juror was wheth-er she had discussed her feelings with the other jurors. She said, "No, your Honor. They were speaking in the room about people being prejudiced or biased, but nobody said anything about being biased or prejudiced." This prompt-ed a request by counsel that the judge conduct an investiga-tion into what had passed among the jurors, and objection was taken to his denial of the request.

The judge understood the juror's statement to mean that there had been a general discussion of bias, no more, and he decided "not to intrude into what they say in social conver-sations."[7] A trial judge has discretion in making the thresh-old determination whether a question of jury prejudice has arisen requiring a voir dire investigation. *Commonwealth* v. *Shelley*, 381 Mass. 340, 352 (1980). *United States* v. *Per-rotta*, 553 F.2d 247, 250 (1st Cir. 1977). We do not think the judge here went beyond lawful bounds in holding that further inquiry was not needed. See *Commonwealth* v. *Horton*, 376 Mass. 380, 393-394 (1978); *Commonwealth* v. *Shelley, supra* at 352-353; *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 115 (1980).

2. *A Bruton question* (Winston). As the defendants had referred to one another in the statements they gave to the police, it became advisable to edit or redact the statements in order to avoid *Bruton*[8] complications if the defendants were to be jointly tried. After redaction defendants Farn-koff and Landry withdrew their motions to sever. The de-fendant Winston persisted, apparently, in objecting to the judge's refusal to sever. During the cross-examination of Detective Hayes on the part of Farnkoff, Hayes testified that Farnkoff about the time of his arrest "stated he did not know Winston or Landry, that they were just brief acquaint-ances, and [he] didn't hang around with them and had

---

[7] At the close of the evidence the judge gave instructions on bias.

[8] *Bruton* v. *United States*, 391 U.S. 123 (1968), developing the difficul-ties under the Sixth Amendment in admitting the confession of a defend-ant which implicates another defendant in a joint trial.

nothing to do with them." At the close of this examination the judge (evidently without request) instructed the jury that Farnkoff's statement as related by Hayes was not admissible against Winston or Landry. Nevertheless Winston demanded a mistrial.

Winston argues that Hayes' recital of Farnkoff's statement did not quite conform to Farnkoff's remark in the redacted statement, but the point seems captious.[9] The material argument is that the linkage of Winston with Farnkoff and Landry (whether in the statement or in Hayes' version) was in violation of the *Bruton* principle. However, "not every introduction of a statement at a joint trial which is admissible against only one of the defendants, but tends to implicate the other, requires reversal." *Commonwealth* v. *Corradino*, 368 Mass. 411, 419 (1975).[10] The question is whether on a review of the whole record the statement was "sufficiently prejudicial," so that the average jury would have found the Commonwealth's case against the affected defendant "significantly less persuasive" without it. *Ibid.* We think there was no such likelihood even apart from the judge's cautionary instruction. True it is that on occasion even an indirect reference can be severely damaging. See *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 8-9 (1973); *Commonwealth* v. *Horton*, 376 Mass. at 390. Here, while averring some acquaintance with Winston and Landry, Farnkoff minimized it. But more important, the jury had before them such evidence regarding the connection that the elimination of the Farnkoff source could figure only as trivial. Not only was there testimony from the victim placing the defendants together in the whole criminal enterprise; Frank

---

[9] Farnkoff's remark was: "I [Detective Hayes] asked him [Farnkoff] if he were with John Landry or John Winston. He stated he hardly even knew them and did not hang around with them." Winston objected to the version testified to on the ground that it incorrectly suggested that he volunteered the proper names of the other defendants.

[10] Citing *Harrington* v. *California*, 395 U.S. 250, 253-254 (1969), *Schneble* v. *Florida*, 405 U.S. 427, 430-432 (1972), and *Brown* v. *United States*, 411 U.S. 223, 231 (1973).

Velozo, called as a witness by Winston, placed the defend-
ants in convivial association at the Ground Round that night
(and testimony by John Hunt was to the same effect).

3. *Victim's outburst* (Farnkoff and Winston). The victim
underwent cross-examination by each defendant in turn.
During the second cross-examination, when she was chal-
lenged about her identification of Winston, she burst out
with "Yes, and it is him. I am telling you, if it is not him let
him come up and tell me it isn't." All the defendants moved
to strike the statement as being a violation of Winston's
Fifth Amendment privilege not to take the stand, and, by
extension, also a violation of the same right of the other de-
fendants.[11] Perhaps in the circumstances the constitutional
claim is better put as a right to have the judge dissipate the
jury's possible thought, springing from the victim's remark,
that an inference adverse to Winston (and so to the other
defendants) might be drawn from his failure to testify. See
*Commonwealth* v. *Eagan*, 357 Mass. 585, 592 (1970); *Com-
monwealth* v. *Hawley*, 380 Mass. 70, 85-86 (1980); *Com-
monwealth* v. *Lee*, 4 Mass. App. Ct. 453, 459 (1976). See
also *Commonwealth* v. *Paradiso*, 368 Mass. 205, 211 (1975).

The judge's first and sensible response was to call a strate-
gic recess. At the side bar, Winston and Farnkoff moved for
a mistrial. (It is unclear from the record whether Landry
also so moved, but he does not argue the point on appeal.)
These motions were denied. The judge offered to give a
cautionary instruction but Winston (without demur by the
other defendants) asked him not to do so, presumably be-
cause it might underline the victim's comment; Winston
said he preferred to have the judge deal with the matter in
his final instructions. However, when the trial resumed,
the judge, after stating that the victim's remark was struck,
went on to say that in a criminal case the burden is on the
Commonwealth, and only on the Commonwealth, to prove

---

[11] Indirect references to a defendant's failure to testify may be just as in-
vidious as direct references. See *Commonwealth* v. *Hawley*, 380 Mass.
70, 82-83 (1980).

the elements of the offense beyond a reasonable doubt.[12]   In the final instructions the judge charged fully not only on the burden but on the privilege of a defendant not to testify.

The calling of the recess, the striking of the offensive remark, and the judge's instructions seem to us to have been sufficient to rub out any impression that might otherwise have stayed with the jury.   We speak here not so much of the "formal correctness" of the judge's response, as of its "capacity actually to reach the trouble generated in the jury's mind."   *Commonwealth* v. *Hawley, supra* at 86. Comparable decisions, dealing with judicial reactions to episodes at trial threatening the Fifth Amendment privilege, include:   *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954); *Commonwealth* v. *Eagan*, 357 Mass. 585, 592 (1970); *Commonwealth* v. *Morgan*, 369 Mass. 332, 340-342 (1975); *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571-572 (1976).   Cf. *United States* v. *Flannery*, 451 F.2d 880, 882 (1st Cir. 1971).

4. *Nondisclosure of photographic identifications* (Farnkoff and Winston).   During cross-examination of the victim and of Detective Hayes it appeared that on two occasions arrays of pictures had been presented to the victim for identification purposes.   Farnkoff and Winston complained that the Commonwealth was at fault in failing to make pretrial disclosure of those episodes, and they moved for voir dire examination into the circumstances of the identifications or for a mistrial.

The defendants pointed to the Commonwealth's undertaking in a "pretrial conference report" dated September 15, 1981, to provide (among other things) an "inventory of physical evidence."   But the last quoted language cannot be

---

[12] The judge cautioned defense counsel to avoid repetitious questioning in their cross-examination of the victim.  She had been in tears throughout her testimony.  Before cross-examination resumed the judge also advised the victim to be careful and thoughtful in her answers.  (Farnkoff complains that the situation thus created denied him opportunity for vigorous cross-examination, but he does not point to places where he was inhibited, nor do we perceive any.)

fairly read to extend to the identification material; rather it covered such things as the articles of clothing found by the police at the clearing. That the parties would not have had in mind photographic identification becomes fairly clear when we consider the situation as of the date of the conference report. At that time the Commonwealth had in hand statements by the defendants implicating them all. Any photographic identification became of minimal importance. If omission from the conference report (as we read it) of this subject was thus quite natural, so was the failure of the defendants to move for discovery concerning it. A photographic identification could become more important when redaction occurred (and when Winston's statement was in substance eliminated, see point 5 below). But this did not prompt the parties to take a fresh look at the scope of the discovery to which they had agreed. The Commonwealth, moreover, was still not intending to use any photographic identification at trial.

The defendants argued that, even in the absence of a relevant pretrial arrangement or a motion to compel discovery, the Commonwealth was bound to make the disclosure. They cited *Commonwealth* v. *Dougan,* 377 Mass. 303 (1979), which holds that a defendant's due process right to identification procedures meeting a certain level of fairness carries with it a right to secure (at least on request) information about out-of-court identifications even if these are not used at trial. In *Dougan* the Commonwealth had assured counsel for the defendant Linehan that the victims knew Linehan and had named him as participating in the crime; but just before the trial began counsel learned that there probably had been a photographic identification by the victims. Counsel, insisting from the outset that this was a case of "mistaken identity," requested a pretrial testing of the victims' identification, which the judge refused; the judge also denied a voir dire on the same subject in the course of trial. The victims' identification testimony at trial was notably weak. Accordingly the Supreme Judicial Court reversed Linehan's conviction and said that in the event of a

new trial he would be entitled to a pretrial voir dire exami-
nation to develop the circumstances of the out-of-court
identification.

The present case is distinguished from *Dougan* by the fact
that no false assurance was given by the Commonwealth,
nor did the defendants ever attempt prior to trial to secure
any test of identifications by the victim. Nevertheless, espe-
cially with the likely change in the shape of the trial conse-
quent upon the redaction, the judge would have done well
to suspend trial and allow a voir dire examination so that
defense counsel could inquire into the incidents of the arrays.
The judge here did direct that counsel for the defendants be
shown the pictures during a recess, and he undertook to
allow counsel, if they chose to pursue the matter, to recall
any witnesses for interrogation as part of the trial. Counsel
viewed the pictures but did no more, except to continue to
press their motions.

After hearing these appeals, we directed the trial judge,
at the instance of any defendant, to conduct a hearing in the
nature of voir dire into the facts and circumstances of the
photographic displays, and to return the transcript with his
findings, including findings as to any possible prejudice to
the defendants. Our purpose was to invite any further elu-
cidation and to make and preserve a record before memories
faded. The hearing occurred in April, 1983.[13] There were
appearances for all defendants. Neither side located the
victim, and the defendants called only Detective Hayes. His
testimony fixed the time of the first array as before the ar-
rests of Farnkoff and Winston, probably July 13; from this
array the victim selected the pictures of Farnkoff and Win-
ston. The time of the second array was shortly before the
day fixed for trial; the victim selected Winston's picture
(one made at the time of his arrest).[14] The victim's choices

---

[13] The judge's findings are marred by some inadvertences, but their sub-
stance is clear.

[14] From cross-examination of the victim and Hayes the jury could learn
that the victim had selected pictures of Winston from the two displays.

were consistent with her previous descriptions as reported by Hayes. Concluding his findings, the judge stated: "I find that neither array was unduly suggestive. I further find that . . . [the victim] is and was accurate and detailed in observation and memory, and had a sound independent basis for her in-court identification of all three defendants. The circumstances under which she made her observations were such as to make an indelible impression on her." We may add, as our narrative has shown, that the trial record contains important corroborative proofs, cumulative upon the direct identifications, tying the defendants to the crimes. See *Chapman* v. *California,* 386 U.S. 18, 24 (1967); *Monteiro* v. *Picard,* 443 F.2d 311, 313 (1st Cir. 1971). (In respect to the strength of the proof of guilt, the present case again diverges significantly from *Dougan.*)

5. *Objection to calling of prosecution witness* (Winston). Upon receiving his Miranda warnings on July 14, Winston said his brother was going to try to get him a lawyer but he did not know who it would be. Then he asked Hayes to advise him what he should do. Hayes said he couldn't advise him — "[h]e had an option — he could either speak to me or not speak to me." Winston moved at pretrial to suppress his statement to Hayes on the theory that Hayes should have closed the interview as soon as the brother's quest for a lawyer was mentioned. Upon the denial of the suppression motion, Winston had the right to apply for leave to take an interlocutory appeal. Mass.R.Crim.P. 15(b)(2), 378 Mass. 884 (1979). He waived the right in exchange for a stipulation by the Commonwealth, made orally, that "the statement will not be used in any form by any witness" (or "in any form or manner").

When the Commonwealth called John Hunt as a witness at trial, Winston objected, claiming that the Commonwealth came by Hunt by following up on Winston's statement, and then to present Hunt as a witness, Winston argued, was prohibited by the stipulation. In response, the Commonwealth protested that the stipulation went to the use of the statement itself as evidence; it did not go so far as

to prevent the calling of a witness found through the investigative use of the statement. The judge's denial of Winston's motion to disqualify Hunt can rest on that reading of the stipulation. Anyway, what Hunt had to say did not improve materially on the testimony of the victim and Velozo. The parties discuss the bearing of *United States* v. *Ceccolini,* 435 U.S. 268 (1978) (see also *Commonwealth* v. *Caso,* 377 Mass. 236 [1979]; *Commonwealth* v. *Gallant,* 381 Mass. 465, 470-471 [1980]), but that decision is irrelevant. *Ceccolini* states the conditions on which a live witness, found by the use of evidence garnered by the State through its violation of an "exclusionary" rule (in the particular case, an unlawful warrantless search) may yet be called as a witness on the State's behalf. The Court considered the circumstances in which the rejection of evidence from such a source was or was not necessary to preserve the integrity and purpose of the given prohibitory rule. In the present case an analogy to *Ceccolini* might be suggested if Hunt had been found after the making of the stipulation assumed to have the scope that Winston claims; but, apart from the question of the meaning of the stipulation, there was no showing that Hunt was found at so late a stage.

6. *Strength of the case on kidnapping* (Landry). When the Commonwealth rested, Landry moved for a required finding of not guilty on the kidnapping charge. The motion was properly denied. It is true that Landry, as passenger in the front seat of the car, was not shown to have participated physically in the initial abduction of the victim from the parking lot at Kitty's; but there was plenty of evidence — enough to satisfy the requirements of *Commonwealth* v. *Latimore,* 378 Mass. 671, 678 (1979) — that he joined thereafter in the forcible confinement of the victim against her will. In fact Landry was obliged finally to concede as much in his discussion of the matter with the judge.

7. *Withdrawal from a joint enterprise* (Landry). Landry complains of the failure of the judge to instruct on this topic but the record shows no more than some discussion of the point. There was opportunity for a plain request to instruct,

but none was made, nor was a relevant objection taken at any time. Had the claimed error been preserved, it would not avail. To withdraw effectively from a joint enterprise, a venturer must cease any tendentious activity and announce to the others an intention to do no more, this communication occurring in such time as to allow the others to quit, if they are so minded, before they go on to commit the criminal act. See *Commonwealth* v. *Graves*, 363 Mass. 863, 866-867 (1973); *Commonwealth* v. *Mangula*, 2 Mass. App. Ct. 785, 792 n.6 (1975). The earliest point at which Landry can possibly be conceived to have expressed himself as backing out of the enterprise was the moment when he kicked Winston off the victim, but by that time he had himself assaulted, raped, and kidnapped the victim, and the others had done the same. There remained only the coda, so to speak, of the return from the clearing, and in this interval Landry is found participating in the abduction until the transfer to his car, and possibly even thereafter. There was no basis in the evidence for a charge on withdrawal. See *Commonwealth* v. *Caine*, 366 Mass. 366, 375 (1974); *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975); *Commonwealth* v. *Hooks*, 375 Mass. 284, 291-292 (1978).

*Judgments affirmed.*