COMMONWEALTH *vs.* WILLIAM M. JOYCE
(and companion cases[1]).

Suffolk. March 19, 1984. — August 2, 1984.

Present: BROWN, DREBEN, & WARNER, JJ.

*Homicide. Proximate Cause. Joint Enterprise. Jury and Jurors. Practice, Criminal,* Challenge of jurors, Instructions to jury. *Witness,* Impeachment, Hostile witness.

At the trial of indictments for manslaughter, there was sufficient evidence to enable the jury to find beyond a reasonable doubt that the defendants, along with other young men, attacked the victim with rocks and bottles, with the result that the victim attempted to escape the attack by jumping down from the elevated platform of an MBTA train station onto the tracks, on which he continued to run or walk until struck and killed by a train several minutes later. [420-421]

At the trial of an indictment for assault by means of a dangerous weapon, arising from an attack on the victim by a group of young men armed with rocks and bottles, the evidence was sufficient to allow the jury to infer that the victim saw one or more of the young men with these weapons and was fearful. [421]

At the trial of indictments for manslaughter and assault and battery by means of a dangerous weapon, arising from an attack on the victims by five young men armed with rocks and bottles, the evidence was sufficient to allow the jury to find that one of the two defendants actively participated in, or at least placed himself in a position to render aid and encouragement to, a joint enterprise with the purpose of assaulting one of the victims and that the enterprise resulted in the victim's being struck and killed by a train while attempting to escape from an MBTA train station in which the attack occurred. [421-422]

At the selection of jurors for trial of a white defendant for manslaughter in the death of a black victim, the information before the judge was sufficient for him to conclude that the defendant's exercise of peremptory challenges was intended to exclude from the jury members of a discrete racial group, and thus no error appeared in the judge's refusal to allow a peremptory challenge to a certain black juror, even though the defendant offered to withdraw his previous challenge to a different black juror. [422-424]

---

[1] Against William M. Joyce and Francis X. Devin.

The judge at a criminal trial did not abuse his discretion by allowing the prosecutor to cross-examine and attempt to discredit prosecution witnesses. [424-425]

The judge at a manslaughter trial correctly charged the jury that, to find the defendants guilty, they must conclude that the defendants' conduct was the cause that necessarily set in operation the factors which caused the victim's death. [425-426]

At the trial of indictments for manslaughter and assault by means of a dangerous weapon arising from an attack by five young men upon the two victims, it was error requiring reversal for the judge to refuse to instruct the jury on the issue of withdrawal by one defendant from a joint venture, where such an instruction was requested by that defendant and where, on a view of the evidence favorable to him, the instruction was warranted. [426-430]

INDICTMENTS found and returned in the Superior Court Department on March 30, 1982.

The cases were tried before *Roger J. Donahue, J.*

*George Donovan* for William M. Joyce.

*Geoffrey C. Packard* for Francis X. Devin.

*John A. Kiernan,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. The defendants, Joyce and Devin, were each convicted on three indictments for assault with a dangerous weapon and one for involuntary manslaughter. They allege numerous grounds of appeal, including insufficiency of evidence, improper disallowance of their peremptory challenges to one of the jurors, and failure properly to charge the jury. We affirm Devin's convictions but reverse those of Joyce because we conclude that he was entitled to an instruction on withdrawal from a joint venture. We shall state the facts relevant to each claim in our discussion of the issues.

1. *Motions for required findings of not guilty.* Joyce claims that there was insufficient evidence to convict him of any of the charges. Devin makes that claim as to manslaughter and to the charge of assault with a dangerous weapon against one William Grady.

A jury could have found the following facts. On March 13, 1982, at approximately 12:30 A.M., William Atkinson (a black

man) and William Grady (a white man) were walking westward along Savin Hill Avenue in Dorchester. The two defendants and three other young men were in a brown car driving along the same street in the opposite direction when they came upon Atkinson and Grady near the Motley School. One of the car's occupants shouted, "Hey nigger, we're going to kill you." When Grady responded that Atkinson was his friend, someone in the car said, "We'll kill you too." The car then turned around and chased the two men along Savin Hill Avenue, its occupants screaming racial epithets and threats. A bystander who observed Atkinson's face during the chase stated that he looked scared and confused. The MBTA train station was some 400 feet away from where the chase began, and Atkinson and Grady ran into it seeking refuge. Grady told the MBTA collector to call the police because they were "being beat up on." The two men ran down a flight of steps and onto the platform.

At that time the only entrance to the station was from Savin Hill Avenue. A set of stairs descended from the entrance to the train platform below, and the platform extended some 330 feet from the foot of the stairs. On the eastern side of the platform were four sets of train tracks (with electrified third rails) bounded by a wall separating the tracks from the Southeast Expressway. On the other side of the platform was the southbound Harvard-Ashmont track, with a third rail. A chain link fence with barbed wire on top separated this track from a parking area.

The five young men ran out of their car and surrounded the train station. Some or all of them stood at the chain link fence and showered the platform with rocks and bottles while repeating racial slurs and threats. Two of the young men (including the defendant Devin) climbed the fence, crossed the track, and reached the platform in pursuit of Atkinson and Grady. Two or three were seen on a bridge on Savin Hill Avenue which overlooked the tracks from which point further threats were hurled. When he saw the youths start to climb the fence, Grady told Atkinson, "Let's get out of here," and ran back up the stairs where he was knocked unconscious by one of the young men. Fearing for his life, Atkinson pursued the only means of

escape left, that is, he jumped off the platform and ran southward down the tracks. Some seven minutes after his jump, Atkinson was struck and killed by an MBTA train about 1,750 feet from the end of the platform.

Some time during the fracas at the station another white man, Mark Darling, climbed over the fence onto the platform. At least some of the young men apparently mistook Darling for Grady and threatened him. He drew a knife and sought to escape by running up the stairs, where he found Grady's unconscious body. He then ran down to the platform, where he was further harassed. Like Atkinson, he sought refuge by jumping into the "pit" and running down the tracks. He stopped when he reached the end of the platform and hid in a small space he knew to be there.

The defendants were charged with manslaughter in the death of Atkinson and with assaulting Atkinson, Grady, and Darling with dangerous weapons, to wit, rocks and bottles. They were tried on a theory of joint venture. At the conclusion of the Commonwealth's case both defendants moved for required findings of not guilty. We conclude that there was sufficient evidence to warrant sending the case to the jury on all the indictments and that the defendants' motions were, therefore, properly denied. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-679 (1979).

1(a). *Manslaughter. Devin's claims.* Both defendants implicitly concede that most of the elements of manslaughter were present. See generally *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967). Nor do the defendants challenge the principle, assumed to be valid in *Commonwealth* v. *Bianco,* 388 Mass. 358, 362-363 (1983), that "if, by a wrongful act, a man 'creates in another man's mind an immediate sense of danger which causes such person to try to escape, and in so doing he injures himself, the person who creates such a state of mind' is criminally responsible for those injuries." The thrust of Devin's argument is that there was insufficient evidence that the attack on Atkinson was the proximate cause of his death. Based on the body's distance from the platform and the time which had elapsed before Atkinson was hit, Devin claims that the Commonwealth's proof failed because there was

no evidence that at the time he was killed Atkinson was still in flight. He also claims that the presence and behavior of Darling, who had drawn a knife, was as likely to cause Atkinson to jump as the actions of the joint venturers. We reject the claims, as there was evidence that Atkinson took the only route of escape and that once on the tracks, he had no reasonable alternative but to continue to run or walk along them until he reached the next station, or at least a point beyond where he was killed. There was also evidence that Darling drew his knife in direct response to the attack on him by the young men and that he never saw Atkinson. The defendants' actions need not have been the sole cause which contributed to Atkinson's death. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 823 n.12 (1980). The Commonwealth met its burden of showing that the attack was the "efficient cause, the cause that necessarily set[] in operation the factors which caused the death." *Id.* at 825.

1(b). *Assault with a dangerous weapon against Grady.* Devin argues that there was insufficient evidence of the assault with a dangerous weapon against Grady because there was no testimony that a rock or bottle was ever thrown at Grady. Devin relies on Grady's statement at trial that he did not hear any bottles smash until he had reached the top of the stairway. Not only was there evidence from others that a shower of rocks and bottles came onto the platform at about this time; it can also be inferred that Grady saw one or more of the young men with these weapons prior to their having been thrown, and was fearful.

1(c). *Claims of Joyce.* Joyce argues there was insufficient evidence that he was actively involved in the attack at the station. While he concedes that he participated with the others in hurling racial slurs and threats from the car, he emphasizes that there is evidence that he also told the others in the car to leave Atkinson and Grady alone; that when the car arrived at the station, he told the others that he did not want to participate in what they were doing; and that he left at that time to urinate behind a bar across the street. By his own admission, however, he was away from the station area for only a short time and re-

turned in time to see Grady hit by one of the young men. There was evidence that five people came out of a brown car and stood together at the fence, from where rocks and bottles were thrown at the platform. Other testimony, including his own, placed Joyce at the Savin Hill Avenue bridge when further threats were hurled in the direction of the platform. There was also testimony from Grady that Joyce was the individual who hit him.[2]

We think the evidence was sufficient, under the standards of *Commonwealth* v. *Latimore,* 378 Mass. at 677, for a jury to find that Joyce participated in a joint enterprise with the purpose of assaulting Atkinson and that the enterprise resulted in death.[3] While presence at the scene of a crime, even with knowledge of the planned criminal act, is insufficient to establish criminal liability, see *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980), and cases cited, a jury could properly have inferred that Joyce actively participated in the attack, or at least placed himself in a position to render aid or encouragement to the active participants. *Ibid.* See also *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979); *Commonwealth* v. *Morrill,* 14 Mass. App. Ct. 1003, 1004 (1982). His intent could have been inferred from his threats and from his "knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares, supra* at 470. A jury could conclude that Joyce "neither accidently nor unknowingly associated with an enterprise that contemplated" the attacks on Atkinson and Grady. *Id.* at 471.

2. *Peremptory challenges.* Both defendants challenge the refusal of the trial judge to honor their peremptory challenges to one particular juror. The question is whether the evidence was sufficient for the judge to conclude that the presumption that peremptory challenges are properly used had been overcome. *Commonwealth* v. *Soares,* 377 Mass. at 489-490. *Commonwealth* v. *Reid,* 384 Mass. 247, 254 (1981).

---

[2] At one point in the trial, Grady identified Joyce as his attacker, although at other points he stated he could not say who hit him.

[3] The evidence as to Joyce's participation in the attack is also reviewed in our discussion of Joyce's claim that he was entitled to a jury instruction on withdrawal from the venture. See part 5, *infra.*

All counsel, because of the nature of the case, were acutely sensitive to the racial composition of the jury. On Devin's motion, the "struck" system of jury selection was followed, and each defense counsel was given four additional peremptory challenges, for a total of eight.[4] Before the challenges began there were six black and ten white jurors seated.

The prosecutor made the initial challenges. After he had challenged six white jurors, the judge, on his own initiative, asked for an explanation. No objection was taken by defense counsel, and the six were replaced, one of them by the black juror in question who took seat no. 2. The prosecutor then made two additional challenges to white jurors, one of which was overruled by the judge on Devin's objection.[5]

Counsel for Joyce next challenged three jurors, two of whom were black. He did not object to the juror in seat no. 2. When counsel for Devin challenged five jurors, three of whom were black, the prosecutor complained. At that time there were six black jurors in the box. The judge accepted Devin's explanations except as to the juror in seat no. 2. The reasons given for that challenge were that the juror's voir dire answers were "abrupt" and "too prompt," that his demeanor was "severe" and "humorless," and that he changed his initial response that he had not previously heard of the case. After rejecting Devin's explanation, the judge refused Devin's offer to withdraw his challenge to a black woman if the judge would honor his objection to the man.

We think the evidence was sufficient for the judge to find both "a pattern of conduct" that the challenges were to "members of a discrete group," and "a likelihood they [were] being excluded . . . solely by reason of their group membership." *Commonwealth* v. *Soares,* 377 Mass. at 490. He could also have found that the reasons given by Devin were "sham ex-

---

[4] See generally Mass.R.Crim.P. 20(c)(1), 378 Mass. 890-891 (1979); Rule 6 of the Rules of the Superior Court (1974); *Commonwealth* v. *Walker,* 379 Mass. 297, 299 n.1 (1979); *Commonwealth* v. *Barrows,* 391 Mass. 781, 783 & n.3 (1984).

[5] In a later round of objections, the judge overruled another of the prosecutor's challenges to a white juror.

cuses." *Id.* at 490, 491. Such determinations are for the trial judge to make and are not to be disturbed unless they are unsupported by the record. *Id.* at 490-491. *Commonwealth* v. *Walker,* 379 Mass. 297, 301 (1979). *Commonwealth* v. *DiMatteo,* 12 Mass. App. Ct. 547, 551-553 (1981). While the judge might have accepted the reasons offered, see *Commonwealth* v. *Kelly,* 10 Mass. App. Ct. 847 (1980), he could also have found them disingenuous. See *Commonwealth* v. *DiMatteo,* 12 Mass. App. Ct. at 553. Devin's offer to withdraw a challenge to a black woman in order to effect his challenge to the juror in question may not have removed the taint perceived by the judge. Cf. *Commonwealth* v. *Soares,* 377 Mass. at 488 n.32. The judge was not required to accept the exchange.

In sum, we find no merit in Devin's claim as to the selection of the juror in seat no. 2. To the contrary, an examination of the record shows genuine sensitivity and an evenhandedness on the part of the judge.[6]

In view of our conclusion that Joyce is entitled to a new trial, we do not treat his juror challenge claim,[7] nor do we consider whether, on the evidence, the judge could properly have determined that counsel for Joyce and Devin were not acting wholly independently.

3. *Impeachment by the Commonwealth of its own witnesses.* The prosecutor called five eyewitnesses who had seen, or at least been in positions to see, the young men in the brown car give chase to Atkinson and Grady. All five were friends of one or more of the occupants of the car, and three of them met the occupants at the local beach after the occurrence of the events at the station. The trial judge noted at a bench conference during examination of the fourth witness, "it seems obvious from the last two witnesses that their reluctance to answer questions has nothing to do with their memory. . . . I will

---

[6] We note that the jury that heard the case was composed of eleven white and five black jurors.

[7] He argued that no pattern of racial exclusion was ever shown as to his peremptory challenges and, therefore, that he was entitled to them as matter of right. See, in this regard, *Commonwealth* v. *Soares,* 377 Mass. at 489-491.

allow [the prosecutor] to cross-examine this witness . . ." The judge also allowed cross-examination of the last witness after making a similar determination.

Devin argues that it was error to allow the prosecutor to cross-examine and attempt to discredit his own witnesses. The extent to which counsel can lead or cross-examine his own witness is governed by the sound discretion of the trial judge. *Commonwealth* v. *Monahan*, 349 Mass. 139, 162-163 (1965). *Commonwealth* v. *Fiore*, 364 Mass. 819, 825 (1974). We find no merit in the defendant's arguments that the judge abused that discretion or that G. L. c. 233, § 23, prohibiting impeachment of one's own witness by evidence of bad character, precludes a showing of bias or interest on the part of the witness. Cf. *Commonwealth* v. *Greene*, 9 Mass. App. Ct. 688, 693 (1980).

4. *Jury instructions — claims of Devin.* Devin argues that the trial judge erred in his instructions on causation. In his extensive instructions on the issue, the judge clearly and repeatedly stated that the prosecutor must "prove beyond a reasonable doubt that the defendants' conduct was the efficient cause that necessarily set in motion the factors that caused Atkinson's death." See *Commonwealth* v. *Rhoades*, 379 Mass. at 825. During their deliberations, the jury requested clarification of the meaning of the manslaughter indictment.[8] The judge, in repeating his instructions on manslaughter, stated:

> "It is the prosecution's burden to prove beyond a reasonable doubt that the defendants' conduct was the efficient cause that necessarily set in motion the factors that caused Atkinson's death. If the evidence raises a question that Atkinson's death was solely caused, that is, the sole reason for his death was an independent intervening cause, and that question raises reasonable doubt in the minds of the

---

[8] The jury were apparently confused by the wording, in statutory form, of the manslaughter indictments that the defendants "did assault and beat" Atkinson. See forms appended to G. L. c. 277, § 79.

jury on the issue of proximate cause, then that reasonable doubt must be resolved in favor of the defendants and the jurors cannot find proximate cause."

Counsel for Devin complained that the last quoted sentence could leave the jury with the impression that proximate cause would be demonstrated unless some other single intervening factor (as opposed to combination of factors) was the sole cause of Atkinson's death. In response, the judge reiterated to the jury what must have been by then a familiar formulation: that it must be proved that the "defendants' conduct was the efficient cause, the cause that necessarily set in operation the factor which caused Atkinson's death." No further objection was made.

Viewing the instructions as a whole, we perceive no error. See *Commonwealth* v. *Burke,* 376 Mass. 539, 544 (1978). Unlike the charge in *Commonwealth* v. *Rhoades,* 379 Mass. at 824, it cannot be said here that the "effect of [the] charge was to leave the jury with the impression that if [the defendant's conduct] in any way constituted a link, no matter how remote, in the chain of events leading to [the victim's] death, [the defendant] should be convicted." The jury were clearly informed that the defendants' conduct must be "the cause that necessarily sets in operation the factors which caused the death." *Id.* at 825.

5. *Jury instructions as to Joyce (withdrawal from joint venture).* After the judge completed his initial charge, counsel for Joyce requested an instruction on withdrawal from a joint venture. Although the trial judge stated that he would consider this request, no such instruction was ever given. The judge further stated that he would "automatically save [any] objection" to his failure to grant requested instructions.

We note at the outset that the Commonwealth does not argue that such an instruction was not warranted by the evidence. Rather, it urges that the judge's charge was such that the "jury could not have believed that Joyce would be liable for the assaults and manslaughter if he had left the group" and had not participated in the station attack "since he could not in those

circumstances have shared the mental state for the commission of those crimes."

The difficulty with the Commonwealth's argument is that the jury could have determined, pursuant to the judge's instructions, that a joint enterprise began near the Motley School and ended when Atkinson died.[9] They were not told, by indirection or otherwise, that if they found that one of the joint venturers effectively withdrew but the enterprise continued with the other four, the withdrawing joint venturer would be discharged from liability for subsequent crimes. To the contrary, they were charged that once it had been determined that the defendant was a member of a joint criminal enterprise, each joint venturer became the agent of the others and the acts and declarations of each became the acts and declarations of the others. For this reason, the judge's language was insufficient if the evidence, taken most favorably to Joyce, entitled him to an instruction on abandonment of or withdrawal from a joint venture.

Some of the evidence as to withdrawal comes from Joyce's own taped statement and from a taped statement of Devin, each given to the police about one week after the incident. In his statement, Joyce admitted that he was in the car, that he saw a black man and a white man in front of the Motley School, that he joined the others in yelling, "Nigger, what are you doing in this neighborhood?" He also added, however, "You know I'm sitting back and I say, you know, 'forget about

---

[9] The following language was a central part of the judge's instructions on joint venture:

"A joint enterprise has a beginning and an ending. It would appear to me — but it is for you to determine — that the Commonwealth's theory in this case is that the joint enterprise began some place near the Motley School and ended, as far as the charge of assault with a dangerous weapon is concerned, at the Savin Hill Station and, as far as the manslaughter is concerned, ended at the time that the victim met his demise approximately a third of a mile from the Savin Hill Station. But it is for you to define when the joint enterprise began and when it ended. Because it is only during the joint enterprise that you may consider the act of the others engaged in that enterprise as the acts of the defendant and the statements of the others in the enterprise are the statements of the defendant."

it. Leave him alone. I've already been in trouble you know.'"[10] The car made a U-turn after the black man and the white man had started running toward Savin Hill station. By the time the car was turned around, Joyce "could just see them run into the station." Upon arrival, he claimed he said, "I don't want nothing to do with whatever you're going to do," and went behind a bar to urinate.[11]

According to Devin's statement, Joyce communicated his unwillingness to all the joint venturers. "When we got out of the car, eh, the only thing I can remember is when I got out one of my friends, Billy Joyce, was standing at the front of the car and said, 'I'm not getting into it.' or something like that."

For one to abandon a criminal joint enterprise and thereby escape liability for a subsequent crime, "there must be at least an appreciable interval between the alleged termination and the [subsequent crime], a detachment from the enterprise before the [subsequent crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the [enterprise] have opportunity also to abandon it." *Commonwealth* v. *Green,* 302 Mass. 547,

---

[10] Some six months earlier, Joyce had been convicted of an assault on a black man at the same MBTA station.

[11] The quoted sentence is taken from the following more complete explanation as to what happened when they pulled up to the station. "Well, we pulled the car over on the bridge and Franny [Devin] and Eddy ran down the fence and were hollering 'Shit,' and I was hollering, 'Shit,' and everyone else was. And me and Paul . . . went across the street to Dole's Supermarket there and I went behind Bull Dog's Bar to go to the bathroom. You know, I kept on saying, 'Shit, I've already been in trouble.' I don't even remember going near the train station. They all know I didn't. Cause, you know, just as much as I do, if I'd been in trouble. So, I said . . . 'I don't want nothing to do with whatever you're going to do.' You know, they're all hollering, and everyone's pretty drunk, you know. And that was it. So, I came out from behind Bull Dog's and everyone is standing up in front of the train station there, and somebody was shouting that the colored guy was running down the tracks. Then the white guy came out the front door there, the turnstiles, and then Paul slammed him. I'm not . . . I'm saying, 'What the hell's going on? What are you pulling this shit for?' Cause this is my first night out in months because I'm home with my girlfriend all the time. I didn't know what the hell was going on. So, I just jumped back in Paul's car and went down the train . . . . I left the a . . . Savin Hill Beach, I mean."

555 (1939) (insufficient evidence to require abandonment instruction in trial of defendant for felony-murder). See also *Commonwealth* v. *Graves,* 363 Mass. 863, 866-868 (1973); *Commonwealth* v. *Mangula,* 2 Mass. App. Ct. 785, 792 n.6 (1975); *Commonwealth* v. *Farnkoff,* 16 Mass. App. Ct. 433, 447 (1983).

Although the evidence would warrant a finding that an assault had occurred prior to the car's arrival at the station (the "we'll kill you" statement to Atkinson and the chase to the station), the theory of the Commonwealth's case on manslaughter was based on the fear provoked in Atkinson by the events at the station, that is, the assaults with dangerous weapons. The appreciable interval must, therefore, be between the crimes or acts in which Joyce had participated prior to his arrival at the station and the additional crimes committed at the station. Looked at most favorably to Joyce, his statement in the car ("Forget about it. Leave him alone.") is some evidence, perhaps scant, that although originally an active hurler of epithets, he wanted to avoid the chase to the station. That statement was coupled with evidence of his later statement that as the car arrived at the station and the men were getting out, he wanted "nothing to do with whatever you're going to do," that he went off to urinate, and that on his return after seeing his friend Paul punch Grady, he complained, "What the hell is going on? What are you pulling this shit for?"

Whether Joyce was to be believed, and whether he had effectively detached himself from the enterprise before the crimes at the station had become so probable that they could not reasonably be stayed cannot here, we think, be answered as matter of law. They are questions "for the jury to determine." *Commonwealth* v. *Dellelo,* 349 Mass. 525, 530 (1965). See also *Commonwealth* v. *Griffey,* 453 Pa. 142, 146 (1973). Contrast *Commonwealth* v. *Green,* 302 Mass. at 555; *Commonwealth* v. *Farnkoff,* 16 Mass. App. Ct. at 447. The fact that Joyce, by his own admission, returned and thus did not completely physically disassociate himself from the others *is a* factor weighing against withdrawal, but we do not think it precludes a finding of withdrawal as matter of law. While the

evidence is not strong, we consider it sufficient to permit a jury finding of withdrawal. Accordingly, a jury instruction was, upon request, required.

As we conclude that a new trial is required for Joyce, we do not reach his other claims of error which are not likely to arise upon retrial. The judgments as to Devin on the four indictments are affirmed, those of Joyce are reversed, the verdicts set aside, and the indictments against him are to stand for a new trial.

*So ordered.*